[No. 32288.  Department Two.  April 14, 1953.]

CLARENCE BENGSTON, *Appellant,* v. SAM SHAIN *et al.,*
*Respondents.*[1]

[1]Reported in 255 P. (2d) 892.

*Geo. Olson* and *George F. Ward,* for appellant.

*Clarke, Stone & Hoover,* for respondents.

SCHWELLENBACH, J.—Plaintiff commenced action against defendants alleging that, on August 1, 1950, he and they entered into an oral agreement of partnership for the operation of a tavern, under the terms of which Plesko would have a one-half interest, and he and Shain would each have a one-quarter interest; that later the defendants informed him that they would no longer recognize his interest in the tavern. Plaintiff elected to dissolve the partnership and prayed for an accounting. He appeals from a judgment holding that he does not have any partnership interest in the business and allowing him the sum of $786.44 in full discharge of all claims he may have against defendant Shain.

Bengston commenced to work for Shain during February, 1948, in Shain's pawnshop in Seattle, as a watchmaker and clerk. Shain had previously operated a tavern, and Plesko had been his bartender. In July of 1950, Mr. and Mrs. Plesko came into the pawnshop and asked Shain if he would be interested in buying a tavern. There is a conflict in the testimony as to what occurred during that conversation.

Bengston testified:

"And Mr. Shain asked if I would be willing—if they bought the tavern if I would be willing to work in a tavern, that is, in the capacity of a partnership. I said I would. So we reached an agreement. Q. What was the agreement you reached? A. Well, I was to work at the pawnshop from—which I did from 10:15 until 4:00 in the afternoon. Then I was to work at the tavern from 6:00 until closing time. And I was supposed to receive one-half of Mr. Shain's interest for my work there. . . . I was not to draw any money out of the tavern. THE COURT: You mean you or somebody else? A. I or Mr. Shain, either one. Whatever money or wages and the earnings of the tavern was to go to pay off this contract, that is, our share of it. Q. (by Mr. Ward) Did you agree to that? A. Yes."

Bengston did not know anything about taverns. He had never worked in one. He took no part in any of the negotiations for the purchase of the tavern. He said that he heard Plesko and Shain state that they were going to pay $38,000 for the tavern. He did not know how much they were going to pay down. He testified: "I was not concerned about how much it was going to cost them." He never made any demand for an accounting while he worked at the tavern. He admitted that, in his negotiations with Shain, nothing was said about any possible losses.

Shain's version of the transaction was somewhat different. It was that Mr. and Mrs. Plesko came into the pawnshop and asked him if he would become their partner in a tavern; that Bengston was five feet away. He testified:

"I said, 'Now, would it be alright with you, Chuck, if Joe would work in my place because I don't want to work in the tavern. I don't mind investing my money, but I don't want to work in it.' "

He gave as his reason that his feet troubled him. Plesko agreed to the arrangement.

Shain testified further:

"I turned around and asked Joe. I said, 'Joe, will you work for me if I give you half of my share of the profits for compensation for working for me there?' He said, 'Yes,' and that is all there was to it."

Plesko testified that Shain's version of the conversation was correct. The trial court admitted in evidence an unsigned carbon copy of a partnership agreement between Plesko and Shain. At any rate, Plesko put in $16,000 and Shain, $6,000. Shain sent Bengston to the office of Mr. Stone (Plesko's attorney) to make application for a liquor license. The license was issued to Plesko, Bengston, and Shain. Shain's explanation of this was that it was to avoid having Bengston join the union, and that the rough element would respect him more if they saw his name on the license.

Bengston worked at the pawnshop from 10:15 to 4:00, for which he received a salary of $75 per week (the same as before) and at the tavern from 6:00 p. m. to 1:00 a. m.,

as bartender and manager. He did not draw any money from the tavern. Shain's explanation of this was that he asked Bengston to loan him what Bengston had coming, in order to help Shain equal his share with Plesko; that Bengston agreed; that Bengston had loaned Shain money before.

Dave L. Allen, Jr., chief of the services branch of the O. P. S. in Seattle, testified that he was in the pawnshop during the fall of 1950 and asked Shain if Bengston were his partner in the tavern, and that Shain replied, "No, he is working for half of my share of the profit"; that Bengston was within hearing distance and made no reply.

Mrs. Bengston testified concerning a conversation with Shain about two months after Bengston started to work in the tavern, in which she told him that she wanted a new car; that Shain replied, "Why don't you wait and when Joe's share in the tavern is paid off, you will have that money and then you will have the interest from the money that the tavern will be making after the contract is paid off, and you will be able to get all that stuff then."

There was also introduced in evidence plaintiff's exhibit 1, which was designated, "Audit Report—Year 1950" for the Scenic Tavern. The report was prepared by Sam Blockoff, a licensed public accountant, who testified that he set up the capital accounts pursuant to the instructions of Plesko and Shaïn. The report contains the following:

"LIABILITIES & NET WORTH

CURRENT LIABILITIES:

| | | |
|---|---:|---:|
| Tavern Contract | $ 16,000.00 | |
| Bank Note | 2,500.00 | |
| Acrued Taxes | 777.94 | |
| Accrued Expenses | 114.54 | |
| TOTAL LIABILITIES | | 19,392.48 |
| NET WORTH: | | |
| Charles Plesko—Capital | 16,972.87 | |
| Sam Shain—Capital | 6,748.94 | |
| Clarence Bengston—Capital | 748.94 | |
| TOTAL NET WORTH | | 24,470.75 |
| TOTAL LIABILITIES & NET WORTH | | 43,863.23 |

"SCENIC TAVERN

RECONCILIATION OF PARTNERS NET WORTH

CHARLES PLESKO:

| | | |
|---|---:|---:|
| Investment in Tavern—August 15, 1950 | 16,000.00 | |
| Additional Investment in October, 1950 | 900.00 | |
| Add ½ of Net Profit for 1950 | 1,572.87 | |
| | 18,472.87 | |
| Less Drawings for 1950 | 1,500.00 | |
| NET WORTH—December 31, 1950 | | 16,972.87 |

\* \* \* \* \* \* \* \* \* \*

SAM SHAIN:

| | | |
|---|---:|---:|
| Investment in Tavern—August 15, 1950 | 6,000.00 | |
| Additional Investment in October, 1950 | 412.50 | |
| Additional Investment in December, 1950 | 300.00 | |
| Add ¼ of Net Profit for 1950 | 786.44 | |
| | 7,498.94 | |
| Less Drawings for 1950 | 750.00 | |
| NET WORTH—December 31, 1950 | | 6,748.94 |

\* \* \* \* \* \* \* \* \* \*

CLARENCE BENGSTON:

| | | |
|---|---:|---:|
| Investment in Tavern in October, 1950 | 412.50 | |
| Additional Investment in December, 1950 | 300.00 | |
| Add ¼ of Net Profit for 1950 | 786.44 | |
| | 1,498.94 | |
| Drawings for 1950 | 750.00 | |
| NET WORTH—December 31, 1950 | | 748.94" |

\* \* \* \* \* \* \* \* \* \*

The tavern was quite successful from the start. Shain's feet made a remarkable recovery. January 1, 1951, Shain told Bengston that Mr. and Mrs. Plesko were going to take the night shift, that he (Shain) was going to work the day shift, and that Bengston was to run the pawnshop. Nothing was said at that time as to whether Bengston had any further interest in the tavern.

Their next conversation was in March. Shain then asked Bengston if he still believed that he was entitled to an interest in the tavern. The latter testified:

"Q. And what did you say? A. Well, I was still of the opinion that I was. Q. Well, what did you say? Did you say that? A. I didn't answer him right at the present time. I didn't say anything. I was astounded to think he had mentioned it in that way. Q. What further transpired then? A. Well, that evening I took him home. I drove home in my car. I asked him bluntly, I says, 'Am I out of the tavern now then completely?' And he said yes. I asked the reason. He said he had too much money invested."

The burden of proving a partnership rests upon him who alleges it. In proving a partnership the evidence must be stronger as between the parties themselves than when third persons assert its existence. *Cruickshank v. Lich,* 158 Wash. 523, 291 Pac. 485. A partnership is formed by agreement to place money, effects, labor and skill, or some or all of them, in a lawful business and to divide the profits and bear the losses in certain proportions. *Nicholson v. Kilbury,* 83 Wash. 196, 145 Pac. 189. Contracts of partnership need not specifically provide for the payment of losses, since a contract to divide profits carries with it by implication the provision for the payment of losses. *Dow v. Dempsey,* 21 Wash. 86, 57 Pac. 355.

The existence of a partnership depends upon the intention of the parties. That intention must be ascertained from all the facts and circumstances and the actions of the parties. The existence of a partnership may be implied from circumstances. *Nicholson v. Kilbury, supra.* The mere sharing of the net proceeds of a business venture with an employee, without more, does not of itself convert the relationship between the parties concerned into a partnership. There must be a community of interest in, or a joint ownership of, the business itself, accompanied by a joint right of control of its affairs. *Purdy & Whitfield v. Department of Labor & Industries,* 12 Wn. (2d) 131, 120 P. (2d) 858.

Was Bengston an employee of Shain, under an agreement to share the latter's net proceeds of the tavern venture, or was he a partner? If the record before us were confined solely to the oral testimony of the witnesses as to the relationship of these parties, we would have little hesitancy in

agreeing with the trial court that Bengston was Shain's employee. However, we have the fact that a liquor license was issued to Plesko, Bengston, and Shain, jointly, and that the application for the license was made in the office of Mr. Stone, Plesko's attorney. We are not impressed with the explanation of Shain concerning this part of the transaction. A liquor license is issued either to an individual, members of a partnership, or a corporation, as owner or owners. RCW 66.24.010 provides:

"Every license shall be issued in the name of the applicant and the holder thereof shall not allow any other person to use the license. . . ."

RCW 66.24.020 provides:

". . . No retail license of any kind shall be issued to: . . .

"(4) A copartnership, unless all of the members thereof are qualified to obtain a license, as provided in this section; . . ."

Furthermore, we are confronted with the audit report prepared by a licensed public accountant pursuant to the instructions of Plesko and Shain. That report sets up the capital assets of three partners, Plesko, Shain, and Bengston. In addition, it sets up a "Reconciliation of Partners Net Worth," of Plesko, Shain and Bengston, as partners. No explanation of this audit report was offered by the respondents. Mr. Blockoff was present in court during the trial. If the audit report was not a proper or correct reflection of the books of the partnership, respondents could have introduced them into evidence.

Where relevant evidence which would properly be part of a case is within the control of the party whose interest it would naturally be to produce it, and he fails to do so without satisfactory explanation, the trier of the fact may draw the inference that such evidence would be unfavorable to him. *British Columbia Breweries v. King County,* 17 Wn. (2d) 437, 135 P. (2d) 870.

The two factors, consisting of the audit report drawn up from the books of the Scenic Tavern, and the issuance of the license to the three men, convince us that Plesko and

Shain recognized Bengston as their partner. It is no doubt true that Bengston, having worked for Shain, had implicit trust in him. Nevertheless, there was a community of interest in this business, and, although Bengston did not assert it, he had, with his partners, a joint right of control of its affairs.

The judgment is reversed and remanded to dissolve the partnership and order an accounting of its affairs.

GRADY, C. J., HAMLEY, DONWORTH, and FINLEY, JJ., concur.