OLIVE et al. v. TURNER.
Civ. A. No. 5854.

United States District Court
W. D. Oklahoma.
March 31, 1954.

**480**

Reilly & Ruth, Kingfisher, Okl., and Leon Douglas, Dist. Atty., Vernon, Tex., for plaintiffs.

Shutler, Shutler & Keller, Kingfisher, Okl., for defendant.

WALLACE, District Judge.

The plaintiffs, Caryl Loomis Olive and Bernice Loomis Worthington, citizens of Texas, bring this action against the defendant, A. H. Turner, a citizen of Oklahoma, and ask for a partnership accounting and for dissolution of the partnership or declaratory relief. The defendant denies that a partnership between the parties exists and alleges that the legal relationship between the parties is that of landlord and tenant.

The plaintiffs' cause of action is based upon a written agreement entered into

by and between the parties on August 27, 1947.[1] Although the agreement is entitled "Lease (Standard Form)" plaintiffs urge that this agreement evinces an intent to establish a partnership between the parties and not merely an agricultural lease arrangement; in support of this argument plaintiffs rely in particular upon certain "Special Terms" made part and parcel of the Lease. These Special Terms provide:

"Parties of the First part (plaintiffs) and Party of the second part (defendant) each agree to furnish one-half of all feed and seed, and to share and share alike in everything raised, both live stock, poultry, crops and produce of all kinds, including the cream and eggs.

"Machinery; Party of the second part to furnish and keep in repair all farm equipment, except the special equipment, including truck, cream separator, hay baler, feed grinder, combines, silage cutter and any other equipment that they may mutually decide upon, such special equipment to be furnished and kept in repair on a fifty-fifty basis.

"Labor; Party of the second part to furnish all labor required, except where extra help is needed in crews, such as threshing, baleing (sic), etc, such extra help to be on a fifty-fifty basis.

"Expense; Necessary materials such as twine, baling wire, fuel and oil, threshing and combine bills to be on fifty-fifty basis.

"Party of the second part to have milk, cream and eggs for family use before such produce is divided and said secon (sic) party also agrees to board all hired help, when meals are required, with cost to first party.

"Farm up keep and repairs; Party of the first part to furnish all material required to keep buildings and fences in a usable condition,

1. The plaintiffs' sister, Mrs. Frances Shipman, originally was a party to this agreement; however, in 1953 the defendant purchased all of Mrs. Shipman's interest in the venture in question both realty and personalty.

party of the second part to use such material to best advantage and without further cost to parties of the first part.

"Settlement; Party of the second part agrees to keep a good and sufficient record of all expense and of income received and will submit such record ot (sic) parties of the first part for their audit and approval on the first day of Jany (sic) of each year during the life of this lease or (on any other date mutually agreed upon by all parties concerned,) and to pay to each of the parties of the first part their their (sic) one-third of the net income after their share of the necessary expense has been deducted from their gross income.

"It is hereby understood that the term fifty-fifty used herein is fifty % to parties of forst (sic) part and fifty % to party of second part, and the fifty % to parties to parties (sic) of the first part to be equally divided between the three parties of the first part."

■■■ The Court has carefully studied the sued upon written agreement in an effort to determine the actual intent of the parties.[2] From the instrument itself the Court gains the general impression that such instrument does not evidence an intent to bring about a partnership arrangement. The overall tenor of the written agreement implies that the defendant has leased the realty in question from the plaintiffs and is in the position of a tenant.[3] However, the Special Terms attached to the standard form Lease, although not contradictory to the Lease proper, do give rise to some ambiguity insofar as our common conception of an agricultural lease arrangement is concerned; and, said terms amount to a modification of the general practice of a simple payment of rent in return for a lease. Although these Special Terms cannot be deemed actually repugnant to the first portion of the Lease agreement,[4] the written instrument, viewed as a whole, is sufficiently ambiguous or devoid of clear intent to warrant the introduction of parol testimony for the purpose of establishing the actual intent of the parties at the time of the execution of the instrument in controversy.[5]

Although in the abstract theory of the law it is comparatively easy to define the component parts of a general partnership, often it is very difficult to apply the facts of an individual case to the applicable law; this is particularly true where, as here, the alleged partners are litigating between themselves, as distinguished from where a third party asserts that a partnership exists.[6]

■■■ The general test applicable in the instant case is found in Municipal Paving Company v. Herring:[7]

2. "A contract must be so interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting, so far as the same is ascertainable and lawful." 15 Okla.Stat.Ann. § 152 (1951).

3. Defendant has urged that he was strictly a tenant who had sole control, dominion and charge of his farming enterprise with a duty to pay plaintiffs their proportionate share of income each year in lieu of a stated rental.

4. Thus, there is no need to call into play that statute wherein if a portion of a contract which is originally prepared by the parties is absolutely repugnant to a portion printed or taken from a form such original portion shall govern. See 15 Okla.Stat.Ann. § 167 (1951).

5. " 'Where the meaning of an ambiguous written contract is in dispute, evidence of extrinsic facts and circumstances throwing light on the intention of the parties is admissible, and the construction of such a contract then becomes a mixed question of law and fact * * *.' " Pollock Stores Company v. Draper, 1950, 202 Okl. 546, 215 P.2d 843, 845.

6. Where third persons are concerned, apart from the question of intent, a partnership may be deemed to exist by estoppel, by implication, or operation of law. See 68 C.J.S., Partnership, § 20(b), p. 433.

7. 1915, 50 Okl. 470, 150 P. 1067, 1069. Also, see Miller v. Merritt, 1943, 233 Iowa 230, 8 N.W.2d 726.

"* * * No definite rule has ever yet been laid down which can be said to be a conclusive test as to whether or not a partnership exists inter sese from a given state of facts, but there must be, to constitute the same: (a) An intent on the part of the alleged partners to form a partnership; (b) there must be a participation generally in both profits and losses; (c) there must be such a community of interests as enables each party to make contracts, manage the business, and dispose of the whole property."

■ From all the evidence introduced, including the written agreement and pertinent parol evidence,[8] the Court has reached the conclusion that a modified form of agricultural lease agreement exists between the parties litigant rather than a general partnership.[9]

■■ For several years prior to the time the written agreement here sued upon was executed, the parents of plaintiffs had a contractual arrangement with the defendant somewhat similar if not identical to the agreement in issue.[10] This previous arrangement between said parents and the defendant proved to be profitable and of mutual benefit; plaintiffs' parents had the needed land to lease to the defendant, along with other capital, whereas the defendant proved to be both dependable and possessed of considerable business judgment and ability insofar as farming and cattle raising was concerned.[11]

8. As recognized in 15 Okla.Stat.Ann. § 163: "A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates."

9. Cf. Rowlands v. Voechting, 1902, 115 Wis. 352, 91 N.W. 990, 991, wherein the Court in ruling that a landlord-tenant relationship existed said: "In the first place, as previously noted, no part of the produce is to be delivered to the landlord in specie. The plain provisions of the contract contemplate that the tenant shall sell all the proceeds as he chooses and when he chooses, and keep an account of his sales and expenses, which is to be submitted to the landlord quarterly, and pay to his landlord one-half of the net proceeds. No lien is given to the landlord to secure this payment, nor any right to control or even advise in the prosecution of the business. We think it plain that it was intended to vest the complete title and right and disposition of the crops in the tenant, and that the provisions of the lease relating thereto are simply inserted as a means of measuring the amount of rent to be paid, and not for the purpose of reserving any right therein to the landlord." In the instant case, in addition to the realty described in the Lease contract, certain additional pasture land was rented near Okemah, Oklahoma; however, such a slight deviation from the orthodox agricultural lease practice cannot serve to turn the entire relationship into a partnership venture.

10. As observed by the Court during the trial of this case in ruling upon the admissibility of certain parol testimony: "Apart from the question of competency the Court believes that the evidence submitted by the defendant in regard to the relationship of the defendant Turner and Mr. Loomis (plaintiffs' father) is relevant for the reason that such relationship so directly led up to the August 23 (1947) contract that it has probative force in helping to determine the intention of the parties at the time the August 23 contract was entered into. * * *" As to the competency of the defendant to testify in regard to transactions and communications between defendant and the deceased Loomis, such testimony clearly was competent. "The purpose of the inhibition of [The Dead Man Statute,] section 588 Comp.St.1921 [now 12 Okla.Stat.Ann. § 384], is to prevent a person from testifying to transactions and communications had with a deceased person to the prejudice of his legal representatives or heirs when the voice of the decedent is silent to affirm or deny, *but the rule can have no application where the legal representatives or heirs claim to be a party to the very transaction or communication involved* and take the lead in testifying what said transaction or communication was or was not." (Emphasis supplied) Lieuallen v. Young, 1925, 115 Okl. 153, 241 P. 342, Syl. No. 2. Also, see Berry v. Janeway, 1952, 206 Okl. 555, 245 P.2d 71; Barry v. Hubbard, 1944, 195 Okl. 112, 155 P.2d 512.

11. Although Loomis apparently was experienced in farming and cattle raising he exercised no control over the defendant's activity under the business arrange-

In June or July of 1947 Loomis (plaintiffs' father) who had handled all the personal dealings with the defendant suffered a heart attack; and, in order to make certain that his daughters could enjoy the same profitable business relationship theretofore experienced by Loomis and the defendant, plaintiffs' parents conveyed the realty in question to the plaintiffs and at approximately the same time directed the execution of the written agreement now in issue. At the time of the signing of this August 23, 1947, agreement there was a side understanding between the plaintiffs and their parents that the parents would continue to enjoy all rights and privileges in connection with the venture in question so long as either parent lived. Thus, the parents attempted to see to it that their capital in the hands of their children would continue to earn an excellent return and yet at the same time defer any direct enjoyment of profits by said children until such time as the parents would no longer have any personal need for such income. This side agreement was respected by all parties and the plaintiffs first became entitled to directly enjoy the proceeds of the venture in question in January of 1952, the date of the death of the surviving parent, Mrs. Loomis.

██ ██ ██ This history, although not conclusive in and of itself, tends to persuade the Court that the plaintiffs did not contract for that type of a community interest wherein all parties to the agreement were authorized "to make contracts, manage the business, and dispose of the assets of the venture." The defendant had exercised and apparently was to continue to exercise complete and exclusive responsibility over the realty and the agricultural operation thereon.[12] Admittedly, the mere fact that Loomis had not occupied the position of partner with the defendant would not technically prohibit Loomis' daughters from entering into a general partnership with the defendant; however, inasmuch as the evidence indicates no intention to depart from the then established business practice the previous relationship is of considerable force in determining the actual intent of the parties at the time the instrument in issue was executed.[13]

 A mere community of interest as owners of specific personal property, or the sharing of profits of a particular venture or business does not, in and of itself, constitute a partnership [14] and such community of interest and income sharing is all that the plaintiffs

ment between the two; the defendant was merely required to account periodically for earned income and such was divided between the two. Doubtless, Loomis by observation knew what actions generally were taken by the defendant but there is no convincing evidence in the record that Loomis actively participated in the management of the enterprise.

12. "In determining whether or not an agreement between two or more parties constitutes a partnership, the intention is one of the elements to be determined * * *. If there should be doubt as to just what the intention of the parties was in the written instrument, then the construction put upon the instrument by the parties themselves in the course of their dealings with each other may be shown by oral testimony." Peters v. Fry, 1935, 173 Okl. 30, 46 P.2d 358, 360.

13. That a partnership arrangement was to be created for the first time when the

written agreement in question was signed is unlikely in view of the fact that the daughters knew little if anything in regard to managing an agricultural enterprise; and, all the evidence indicates that the sued upon instrument came into existence because of the plaintiffs' father's desire to make certain that plaintiffs' property was placed in the hands and under the control of one who could be trusted to see to it that the property drew a reasonable return.

14. Byrd v. Byrd, 1948, 199 Okl. 663, 189 P.2d 927; Hawkins v. Mattes, 1935, 171 Okl. 186, 41 P.2d 880; Smittle v. Rutherford, 1941, 188 Okl. 555, 111 P.2d 480. Read, United States v. Wholesale Oil Company, 10 Cir., 1946, 154 F.2d 745. Although, because of the view taken by the Court, it is unnecessary to rule specifically on whether the arrangement in question embraced a sharing of losses as well as income, some question arises in re-

have convincingly established by the adduced evidence; there is no showing that as between the parties there was ever any intent to enter into a general partnership agreement. The absence of such an intent is most strongly implied from the fact that nowhere in the record is there evidence that all parties to this agreement were understood to have joint authority or right in the administration and control of the property in which the community of interest lay, thus making all parties co-principals and agents for the other parties to the agreement.[15] Naturally, where the litigation is between the parties themselves the actual intent must be controlling and ordinarily in such case a partnership should not be ruled to exist by implication or operation of law.[16]

Nowhere in the introduced evidence lies even an inference that the defendant in his operation under this written agreement should be subject in any way to the authority or control of the plaintiffs insofar as the mode of operation of this venture is concerned; the exclusive possession of the land covered in the lease agreement was leased to the defendant [17] and although certain mutual investments were to be made in regard to feed, seed, special equipment and other specifically enumerated operating expenses, under the Special Terms of the written instrument, the defendant's only duty insofar as conferring with plaintiffs was to make a complete and accurate accounting at the end of each year.[18] In the event of a contractual violation by defendant, plaintiffs' remedy lay in terminating the lease and in taking possession of the premises.[19] Obviously, at such time a settling and liquidating of the undivided interests of the

gard to the joint liability of the parties to the agreement inasmuch as although the income is to be divided, no reference is made to sharing losses or liabilities.

15. As observed by the author in 68 C.J.S., Partnership, § 16(b) pp. 425, 426: "An association as partners is not consistent with the relation of master and servant or employer and employee, and, as a general rule, in order to constitute a partnership inter sese, the community of interest between the parties must be of such a nature that it makes each member a coprincipal, and an agent of all the members, in the business, with joint authority or right in the administration, control, or disposal of the business or its property." See Morris v. Savage, 1927, 126 Okl. 221, 259 P. 239. Distinguish instant case from Bengston v. Shain, 1953, 42 Wash.2d 404, 255 P.2d 892.

16. "The prevailing view, even under the earlier doctrines of partnership, has always been that as between themselves the intent of the parties is the controlling element in determining the existence of the relationship * * *. A partnership ordinarily is not created between parties by implication or operation of law in the absence of an expressed or implied agreement to constitute the relationship * * * even though it appears that the parties have agreed to enter into a joint enterprise and share in the profits." 68 C.J.S., Partnership, § 20(b), p. 433.

17. The lease provides in part that the defendant was, "To Have And To Hold the same until (sic) the second party from the 23rd day of August, 1947, to the 22nd day of August, 1957, and said second party in consideration of the premises herein set forth agrees to pay to the first parties as rental for the above described premises the as per special terms attached and that the covenants and agreements of this lease shall shall (sic) extend to and be binding on the heirs, executors, (etc.) * * * "

18. The Special Terms (as quoted earlier in this opinion) provided in part: "Settlement; Party of the second part agrees to keep a good and sufficient record of all expense and of income received and will submit such record ot (sic) parties of the first part for their audit and approval on the first day of Jany (sic) of each year during the life of this lease or (on any other date mutually agreed upon by all parties concerned,) and to pay to each of the parties of the first part their their (sic) one-third of the net income after their share of the necessary expense has been deducted from their gross income."

19. As also provided in the Lease agreement: "3. That upon the failure of the second party to pay the rentals or any part thereof as herein provided, or to otherwise comply with the terms and conditions of this lease, then the first parties may declare this lease thereby ended and

parties in and to the various chattels could take place in a manner like unto the termination of any other venture wherein undivided interests in property exist.

 Although there is some fragmentary evidence which patently tends to prove that the defendant has by his own admissions and actions recognized the existence of a partnership [20] the weight of the evidence is clearly against such a finding; the isolated items of evidence urged by the plaintiffs are not sufficiently persuasive to alter the impact of the evidence in its entirety. At most the word "partnership", which was used by the defendant for the first time several years after the contract in question came into existence, was employed to identify and distinguish this venture's personalty from property individually owned; the word was in nowise used with its legal connotation and cannot be relied upon to overrule the clear effect of all the evidence.

Inasmuch as the plaintiffs have failed to prove the existence of a general partnership they are not entitled to an equal voice in the management of the business venture in question and of course are not entitled to a decree of dissolution.

Naturally, the agreement still stands to protect the plaintiffs' interest and the defendant must comply with the written terms thereof, or subject himself to a cancellation of the agricultural lease agreement and a termination of the business arrangement set up by the Special Terms attached to the lease.[21]

The defendant is entitled to judgment. Counsel should submit a journal entry to conform with this opinion within ten days.

determined, and re-enter and take possession of the premises, and notice of such election and demand of possession are hereby waived."

20. (1) In 1949 and 1950 in connection with the Federal income tax returns filed by Loomis and Turner, the word "partnership" was used on the 1040F Farm Income Schedules. The evidence indicates this was done upon the recommendation of the income tax advisor of Loomis. This is the first evidence in point of time where any of the interested parties used the word "partnership" to describe their relationship; no actual change in operation took place, and such a reference could not serve to alter what basically was and had been a landlord-tenant arrangement. Significantly, the earlier returns of 1947 and 1948 were individual in character and made no mention of partnership; (2) Subsequent to the 1947–48 income tax returns, the defendant entitled certain records "Partnership Account". The defendant testified such was done in order to distinguish such records from his own personal accounts; (3) When the defendant purchased the interest in the property in issue of Frances Shipman, the purchased interest was described as a "partnership" interest; and, the check used to purchase said interest carried the notation that such was for the purchase of the "partnership" interest. However, the mere fact that the undivided interest of Shipman was so entitled does not establish that a general partnership by legal standards was in existence. None of these three items of evidence can be deemed an admission of the existence of a partnership so as to bring the case at bar within the rule recognized in Cobb v. Martin, 1912, 32 Okl. 588, 123 P. 422.

21. There is no evidence before the Court which indicates that the defendant has breached his agricultural lease agreement; the substance of plaintiffs' grievance was that they had been refused the authority enjoyed by general partners and as a consequence wanted to liquidate the undivided interests of the parties.