949 P.2d 291 (1995)
J.F. SCHULTE and Ethelyn Shadid, Appellees.
v.
APACHE CORPORATION, APCO-Program 1980-I, APC Operating Partnership, and Apache Petroleum Limited Partnership 1980-I, Appellants.
No. 81614.
Supreme Court of Oklahoma.
July 11, 1995.
As Corrected November 18, 1997.
As Amended on Rehearing November 18, 1977.
Dissenting Opinion on Rehearing November 18, 1997.
As Corrected March 17, 1998.
Fellers, Snider, Blankenship, Bailey & Tippens, by Terry W. Tippens and Andrew L. Walding, Oklahoma City, for appellees.
Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., by H.B. Watson, Jr. and Sharon Taylor Thomas, Oklahoma City, for appellants.
*293 HODGES, Justice.

I. Issues
The issues in this appeal are (1) whether the trial court violated the mandate of this Court and the law of the case, (2) what is the proper standard of review, (3) whether the plaintiffs met their burden of proof, (4) whether there was competent evidence to support the verdict, and (5) whether the award of attorney fees was appropriate and, if so, whether the trial court erred in the amount awarded. We find the plaintiffs did not meet their burden of proof and the verdict was not supported by competent evidence. Thus, the judgment of the trial court is reversed, and we need not address the other issues.

II. Procedural History
This is the second appeal. In the first appeal, this Court held the trial court erred in granting summary judgment to Apache in that there was a dispute of material facts on the issues of a mining partnership and constructive fraud. Schulte v. Apache Corp., 814 P.2d 469 (Okla.1991) (Schulte I). Much of the present appeal centers around the meaning of this Court's opinion in Schulte I.

III. Facts
The dispute in this case centers around 1,294 acres "earned" by the Mikles No. 1-10 Well (Mikles Well or well). The Mikles Well is located in section 10-10N-22W, Beckman *294 County, Oklahoma. In October 1979, Apache filed an application with the Oklahoma Corporation Commission (Commission) requesting that the oil and gas interest in section 10 be force pooled, including the interests of Fred Shadid and the plaintiffs. Fred Shadid is the husband of Ethelyn Shadid and the father-in-law of J.F. Schulte (plaintiffs). Fred Shadid is a sophisticated oil and gas businessman who has participated in numerous wells for many years. It is uncontested Fred Shadid acted as an agent of the plaintiffs.
In letters of October 29, 1979, and November 2, 1979, Fred Shadid informed Apache (defendant) in writing that he had assigned part of his interest in section 10 to the plaintiffs. In the same letters, Fred Shadid informed Apache that the plaintiffs intended to participate in the well. Thereafter, on November 8, 1979, Fred Shadid wrote A.J. Mason, an Apache landman, and asked the starting date of the well and whether Apache was "getting any contributions from offset leaseholds." In a handwritten note dated November 26, 1979, Mason replied that there were several farmouts involving acreage both within and outside section 10. There was no mention of the plaintiffs sharing in the earned acreage in either of Fred Shadid's letters or of Apache's.
On November 20, 1979, the Commission issued a forced pooling order. On January 23 and February 5, 1980, the Commission issued two correction orders to correct scrivener's errors. All the orders polled the interests in section 10, including the plaintiffs. All the orders stated there were earned acres both inside and outside section 10. In 1985, the Commission issued a clarification which determined that the pooling order did not entitle the participating interest owners to any of the earned acreage.
On November 26, 1979, after the Commission issued its first order, Fred Shadid wrote Apache that he had received the pooling order and elected to take the bonus for his acres and restated the plaintiffs intended to participate in the well. On November 28, 1979, Apache acknowledged the letter and restated its understanding of the election Ethelyn Shadid would participate with her.9722 acres and Jerome Schulte would participate with his 1.944 acres. Neither Fred Shadid's nor Apache's letters mentioned earned acres or that the plaintiffs would be entitled to a share of the earned acres for participating in the production.
On November 28, 1979, Ethelyn Shadid wrote Apache that she had received a copy of the November pooling order and reiterated that she elected to participate in the well. On December 3, 1979, J.F. Schulte wrote Apache and reiterated that he intended to participate in the well. Neither of these letters mentioned the earned acreage. Fred Shadid testified that he sought to confirm the number of earned acres in a telephone conversation with Mason. Fred Shadid further testified Mason responded the amount would be worked out once the well was completed. Fred Shadid did not question whether the plaintiffs would be entitled to a share of the earned acreage. Mason does not remember having this conversation.
In March 1980, before Apache began drilling the well, it sent a joint operating agreement (JOA) to all the interest owners who were participating in the well. Apache had deleted two sections from the standard JOA. One of the deleted sections would have given the owners in the well preferential rights to buy any other party's interest that was being sold. The other deleted section provided any cash or acreage contribution would be assigned proportionately to the drilling parties. Neither of the plaintiffs signed the JOA although all the other parties who participated in the drilling of the well signed into the JOA.
Apache included the plaintiffs on 1979 Merritt Prospect Partnership tax returns. The assets of the partnership included the acreage earned by the Mikles Well. Copies of both these federal and state tax returns were mailed to the plaintiffs. The plaintiffs were not included in the 1980 returns. Plaintiffs did not rely on the 1979 return but treated their expenses as individual expenses and revenues on their tax returns.
The Mikles Well was spudded in March 1980 and in the next November was completed as a commercial producer. Plaintiffs paid *295 well costs attributable only to their acreage but did not pay any costs attributable to the earned acreage. Plaintiffs were paid income based on their ownership of 2.9166 acres in the unit.
Plaintiffs first demanded assignment of their pro rata share of the earned acreage after the well was spudded. When Apache refused, the plaintiffs filed this lawsuit on March 11, 1981. Plaintiffs alleged the pooling order and their election to participate gave them an interest in the earned acres. They also alleged a mining partnership and constructive fraud. As damages, plaintiffs sought a constructive trust, a quite title decree, an accounting, and damages.
Both parties filed motions for partial summary adjudication. The district court ruled in favor of Apache and granted Apache summary judgment. The plaintiffs appealed. This Court addressed this appeal in Schulte I, 814 P.2d at 469. This Court held the pooling order did not entitle the plaintiffs to an interest in the earned acres nor did it create a cotenancy in the well. Further, the parties did not present sufficient evidentiary materials to determine whether the acts of Apache constituted constructive fraud or whether there was a mining partnership. The cause was remanded with instructions to the trial court to enter an order consistent with the opinion.
On remand, the plaintiffs were allowed to amend their petition over Apache's objections. In the amended petition, the plaintiffs alleged claims based on (1) estoppel, (2) constructive fraud, (3) negligent misrepresentation, (4) cotenancy, (5) breach of contract, (6) a mining partnership or joint venture, and (7) conversation.
Apache moved the trial court to enter an order pursuant to this Court's mandate in Schulte I. Plaintiffs objected arguing the amended petition had rendered the motion moot and the amended petition was consistent with the Schulte I opinion. Apache's motion was denied.
Over Apache's objection, the trial court held a jury trial. The jury instructions covered detrimental reliance, implied and express contract, joint venture, and mining partnership. The jury entered a general verdict for plaintiffs for $1,730,133.00. Based on the jury's verdict, the judge entered his Findings of Fact and Conclusions of Law. The judge stated in the Findings of Fact that the Court had previously determined "the equitable relief to which the plaintiffs were entitled, if any, would result from the jury's determination that an implied contract existed... and that it had been breached."
Based on the trial judge's determination that the jury's verdict was based on a breach of contract, the judge divided the jury's damage award ($1,730,133) by the revenues generated by the earned acres ($91,890,931) and determined the plaintiffs were entitled to 24.364 acres of the 1,294 earned. The judge awarded the 24.364 acres to plaintiffs, along with prejudgment interest, and attorney fees.

IV. Standard of Review and Burden of Proof
In actions of equitable cognizance, the trial court's judgment will be reversed if it is clearly contrary to the weight of the evidence. In re Estate of Eversole, 885 P.2d 657, 661 (Okla.1994). In cases of legal cognizance, this Court will affirm the judgment of the trial court where there is any competent evidence to support it. Hamilton v. Allen, 852 P.2d 697, 700 (Okla.1993). Under either standard, we find the trial court erred. Thus, we need not decide whether the case was properly tried to a jury and which standard is proper in this case.

V. Schulte IThe Law of the Case
Apache's first allegation of error is that the trial court violated the law of the case as set out in Schulte I by refusing to enter an order ruling that the forced pooling order did not entitle the plaintiffs to an interest in the earned acreage. Plaintiffs respond that this Court's mandate became moot upon the filing of their amended petition and the pooling order was admissible evidence as the prior statement of a party-litigant.
While an order is admissible into evidence under the proper conditions, it is not a statement of a party, but is a direction of the court or, in this case, the Commission. *296 See Okla.Stat. tit. 12, § 1116 (1991). The testimony underlying the order may be a prior statement of a party, but the order is not. Thus, the Commission's pooling order was a directive of the Commission, not a representation by Apache upon which the plaintiffs could rely as a statement of Apache.
As Apache points out, the trial transcript shows the plaintiffs unjustifiably relied on the pooling order. Fred Shadid stated he, as agent for the plaintiffs, relied on the pooling order because it stated that the Mikles Well had 356 farmed-in acres in section 10 and 900 acres in the sections surrounding section 10. Dr. Shadid later testified he thought that by simply making an election under the pooling order, he was entitled to earned acreage.
Dr. Shadid further testified he was misled by Apache because "Apache applie[d] to the Corporation Commission for pooling. They [got] the pooling order from the Commission and the pooling order state[d] that they were getting this contributed acreage that we have mentioned." Later, Fred Shadid stated he relied on the "[l]anguage of the pooling order and also the usual and customary language that is in the model form operating agreement that all major companies use."
Mr. Eric King, an expert witness for plaintiffs and an attorney who practices in the area of oil and gas, twice testified that absent a joint operating agreement, the pooling order became the "contract of the parties." However, it should be noted Mr. King had not read this Court's opinion in Schulte I.
Jerry Schulte testified that he relied on the pooling order and that he read the pooling order to mean "those people that participated in the well would earn acreage." Mr. Schulte further testified "the pooling order provided the groundwork for our belief that we were going to share in the contributed acreage." Later Mr. Schulte testified that he relied on the pooling order and the custom and practice in the industry as reflected in the standard operating agreement.
In Schulte I, this Court held that the forced pooling order did not create any rights in the plaintiffs to the earned acreage and stated: "There is, however, no genuine dispute of material fact on the issue of whether the commission's pooling order created any rights in the plaintiffs to the earned acreage." Schulte I, 814 P.2d at 472. It is evident from the testimony of both Dr. Shadid and Jerry Schulte the plaintiffs relied primarily on the pooling order to establish the plaintiffs' claims to the earned acreage.
The law of the case as set out by this Court controls all subsequent proceedings. Handy v. City of Lawton, 835 P.2d 870 (Okla. 1992). In this case, the trial court did not enter the order as mandated by this Court and allowed the plaintiffs to present evidence which was in conflict with the opinion of Schulte I and the law of the case.

VI. Estoppel, Constructive Fraud, Negligent Misrepresentation
Estoppel, constructive fraud, and negligent misrepresentation all require that a party rely to that party's detriment on the actions or words of the other party. See Okla.Stat. tit. 15, sec. 59 (1991); Indiana National Bank v. State of Oklahoma Department of Human Services, 857 P.2d 53, 64 (Okla.1993); Restatement of Torts 2nd 1976 sec. 552. The plaintiffs could not have used the pooling order on which to base their claims of estoppel, constructive fraud, and negligent misrepresentation because the pooling order was a directive of the Commission, not a statement of Apache. Further, the plaintiffs did not rely on the representations in the pooling order or of Apache in electing to participate in the Mikles Well because they elected to participate before learning that the well would have earned acreage.
In October 1979, Fred Shadid recommended to Jerry Schulte that he should participate in the Mikles Well. On October 29, 1979, and November 2, 1979, the plaintiffs notified Apache through their agent Fred Shadid of their intent to participate in the well. The Commission did not issue the pooling order until November 20, 1979. The only communications between Apache and the plaintiffs regarding earned acreage occurred after the plaintiffs had notified Apache of their intent to participate in the wells. The plaintiffs only assumed the obligation *297 to pay the well costs attributable to the acres they owned in section 10. The plaintiffs never mentioned participating in the earned acres in any correspondence nor did they offer to pay any costs attributable to any acreage in the unit other than those attributable to their own acres in section 10. Apache never represented to the plaintiffs they would be receiving a share of the earned acreage.

VII. Breach of Contract
The plaintiffs argue that they had either an express or implied contract with Apache to share in the earned acreage. Plaintiffs do not assert they ever discussed with Apache their right to earned acreage. Apache did not expressly or impliedly tell the plaintiffs they would be allowed to participate in the earned acreage. In fact, the only thing Apache did was answer plaintiffs' inquiry about whether the well was getting earned acreage. This was done in a letter and allegedly in a phone conversation. On the other hand, Apache marked out the provision in the JOA which would have allowed plaintiffs to participate in the earned acreage. Plaintiffs refused to sign the JOA and there is no evidence they made a counter-offer. Likewise, Apache did not bill the plaintiffs for the cost associated with the earned acres, and plaintiffs never offered to pay those costs. In fact, Apache paid the cost of the earned acreage for both the Mikles Well and the wells drilled in the surrounding sections.
Both Dr. Shadid and Mr. Schulte testified they based their breach of contract claim on a custom in the industry of a standard JOA providing that the participating interest owners would share in the earned acreage. One of the problems with this premise is that the plaintiffs never signed a JOA.
Because the parties did not sign a contract for the assignment of the oil and gas interest, this Court will not imply such an agreement from custom and usage in the industry.

VII. Joint Venture or Mining Partnership
The three requirements of a mining partnership are: "(1) [a] joint interest in the property by the parties sought to be held as partners, (2) [an] agreement, express or implied, to share in the profits and losses of the venture, and (3) actions and conduct showing cooperation in the project." Edwards v. Hardwick, 350 P.2d 495 (Okla.1960). Cooperation requires more than electing to participate in the production of a well. Sparks Brothers Drilling Co. v. Texas Moran Exploration Co., 829 P.2d 951, 953 (Okla. 1991). Cooperation requires active participation in the promotion, conduct or management. Id. Further, the parties must intend to form a partnership. Dowdy v. Clausewitz, 361 P.2d 288, 289 (Okla.1961). Plaintiffs did not present any evidence they participated in the promotion, conduct or management of Apache's business or the well. Nor does the evidence show Apache intended to form a partnership with the plaintiffs. Neither did plaintiffs' actions indicate they intended to form a partnership.
Plaintiffs rely heavily on a partnership tax return filed by Apache which named the plaintiffs as partners of Apache in the venture. A partnership status is determined by all the facts in the case not just by a tax return. Olive v. Turner, 120 F.Supp. 478 (W.D.Okla.1954). Plaintiffs admit they did not rely on this tax return and it was of no benefit to them. In fact, they filed individual returns without utilizing a partnership status. The plaintiffs do not cite to evidence in the record which supports this theory of recovery. Plaintiffs failed to establish mining partnership, or joint venture.

IX. Cotenancy
In Schulte I, 814 P.2d at 471, this Court reiterated the holding of Wakefield v. State, 306 P.2d 305 (Okla.1957), that a forced pooling order does not create a tenancy in common, and the holding of Tenneco Oil Co. v. District Court of the Twentieth Judicial District, 465 P.2d 468 (Okla.1970), that a voluntary unitization agreement does not create a cotenancy. The plaintiffs did not present any support other than the forced pooling order for this theory and failed to establish a cotenancy.

*298 X. Conclusion
Because Plaintiffs did not meet their burden of proof to establish they were entitled to the earned acreage, the judgment of the trial court is reversed. Likewise the award of attorney fees to the plaintiffs is reversed, and plaintiffs' motion for appeal related attorney fees is denied. See Thompson v. Independent School District No. 94, 886 P.2d 996, 997-98 (Okla.1994). The cause is remanded, and the trial judge is directed to enter judgment for the defendants.
REVERSED AND REMANDED WITH INSTRUCTIONS.
HODGES, LAVENDER, SIMMS and HARGRAVE, OPALA and WATT, JJ., concur.
KAUGER, C.J., SUMMERS, V.C.J., and ALMA WILSON, J., dissent.
SUMMERS, Vice Chief Justice, dissenting on rehearing, with whom KAUGER, Chief Justice, joins.
¶ 1 I would affirm the judgment based on the jury's verdict, but reverse as to attorney's fees and balancing.
¶ 2 In Schulte v. Apache Corp., 1991 OK 61, 814 P.2d 469, we decided that the pooling order did not, by itself, give Plaintiffs an interest in the earned acreage. Plaintiffs had an opportunity to argue in that case (Schulte I) that their status as working interest owners created by the pooling order conferred upon them via industry custom and usage a right to the earned acreage. They did not do so, and upon remand after Schulte I the trial court was told to enter an order consistent with our opinion on this claim. He did not do so. Error must be prejudicial to the party appealing to justify reversal of a judgment. State ex rel. Commissioners of the Land Office v. Landess, 293 P.2d 574, 577-578 (Okla.1955); Norman Plumbing Supply Co. of Okla. City, Inc. v. Gilles, 512 P.2d 1177, 1178 (Okla.1973); Batts v. Carter, 312 P.2d 472, 475 (Okla.1957). The trial court's error in failing to enter the order was not prejudicial, because after remand the action was tried as a detrimental reliance case, and not that the pooling order, by itself, conveyed an interest in the well.
¶ 3 In determining whether legal or equity issues are paramount the trial court determines the nature of the contested issues. I.C. Gas Amcana, Inc. v. J.R. Hood, 1992 OK 119, 855 P.2d 597, 599-600. The issue before the jury was whether there existed an agreement, whether express, implied, or by detrimental reliance for Plaintiffs to possess the earned acreage. As in I.C. Gas Amcana, Inc. v. J.R. Hood, supra, the paramount issue is legal and not equitable. Thus the evidence is reviewed based upon the test of "any competent evidence" to support the judgment of the trial court. LPCX Corp. v. Faulkner, 1991 OK 46, 818 P.2d 431, 436; Silk v. Phillips Petroleum Co., 1988 OK 93, 760 P.2d 174, 176.
¶ 4 Plaintiff Schulte said that he participated in the drilling of the well, signed an AFE, was amenable to providing Apache with cash or a letter of credit, and told Apache in a letter to contact his banker.[1] He said that he knew that the well had earned acreage, but not the extent of the acreage. He testified that he received the JOA with the earned acreage provision deleted, refused to sign, and telephoned individuals at Apache to discuss his concerns concerning earned acreage, his request for an additional AFE for authorizing further expenditures, and Apache's denial of his request for a copy of a title opinion to the well.
¶ 5 Schulte said that in these conversations he told Apache that he would not sign the JOA because of the deletion of the earned acreage provision and his expectation to a share of the acres because he shared in the risk of drilling the well. He testified that Apache responded saying "it's no big deal. You don't get those acres until it's earned, so we don't worry about it until the well is completed. In other words, you don't earn those acres until you achieve the total depth or accomplish whatever the earning requirement *299 was." He said that in his discussions with Apache he had never been told that he was not receiving the earned acres. Shadid testified that in a conversation with Apache in November of 1979 he asked about the earned acreage and was told: "Wait until the well gets down and then we'll discuss the contributed acres."
¶ 6 Defendants assert that the evidence was insufficient on detrimental reliance because detrimental reliance is based upon an express oral or written promise. The jury was instructed that for the purpose of detrimental reliance the promise may be shown by words, deeds, conduct, representations or omissions. Defendants' theory in attacking both the sufficiency of the evidence and the jury instructions on this point is that a promise must be "a promise by express words." They rely upon Strahm v. Bd. of Trustees of Benevolent & Protective Order, 203 Okla. 635, 225 P.2d 159, 161 (1950). Plaintiffs' view on this point, and that used in the jury instructions, is based upon Restatement (Second) of Contracts, § 90.[2] Detrimental reliance and promissory estoppel are a part of this State's common law. Roxana Petroleum Co. of Oklahoma v. Rice, 109 Okla. 161, 235 P. 502 (1924).
¶ 7 The Restatement (Second) of Contracts clearly allows a promise to be expressed by something other than an oral or written express promise. Comment "a" to § 90 is one that relates that section to other sections. The Reporter's Note to that Comment refers to the meaning of a "promise" with citations to various authorities. One of these is to Section 2 of the Restatement where a promise is defined as "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made."[3]
¶ 8 The comments to § 2 are clear that a promise includes "acts", and those acts may arise from written and oral assurances as well as conduct. Comment "a" to this section states that a "`promise' as used in the Restatement of this Subject denotes the act of the promisor." Comment "b" explains that this "manifestation of intention to act" is an external expression of intention (as opposed to internal), and "a promisor manifests an intention if he believes or has reason to believe that the promisee will infer that intention from his words or conduct." (Emphasis added).
¶ 9 The Reporter's Note to § 90 also refers to an article for the meaning of a "promise" where the following is stated:
The cases of unenforceable bargains whether for lack of agreement, indefiniteness of language or lack of mutuality of obligationclearly demonstrate that when reliance is justifiable and serious, the promise requirement of Section 90 is not difficult to satisfy. Indeed, there is considerable evidence that strict requirements of promissory language are not being applied in Section 90 cases today. Section 90 promises are more frequently implied from conduct than was previously true, and patterns of conduct which resembles factual representations rather than promises often suffice.
Henderson, Promissory Estoppel and Traditional Contract Doctrine, 78 Yale L.J. 343, 364 (1969), (notes omitted).
¶ 10 Courts have split on the position of whether the promise must be clear, definite, *300 and unambiguous as to its essential terms as a predicate to its judicial enforcement. See Neiss v. Ehlers, 135 Or.App. 218, 899 P.2d 700 (1995) where that court cited Henderson's article and stated that:
[E]ach position has a substantial number of courts behind it. But that, as indicated by Henderson, the discernable trend of recent decisions is moving away from the view that promissory estoppel is inapplicable as a theory of recovery when the promise is indefinite or incomplete.
Id. 899 P.2d at 704-705.
The Neiss court went on to explain that courts requiring a clear, definite, and unambiguous promise do so in part because of a reluctance to enforce incomplete agreements based upon preliminary negotiations and discussions or upon an agreement to negotiate the remaining terms of a contract in the future. Id. 899 P.2d at 705. The Neiss court then sided with those courts allowing a promissory estoppel claim when the parties have not agreed on each of the essential terms of an agreement.
¶ 11 It is an elementary rule that a detriment suffered by a party in reliance on the promise of another is ample consideration to enforce a promise. Matter of Estate of Hoobler, 1996 OK 56, n. 12, 925 P.2d 13, citing, Commodore Home Systems, Inc. v. Citicorp Acceptance Co., Inc., 1989 OK 46, 780 P.2d 674, 678; 15 O.S.1991 § 106.[4] Plaintiffs' evidence was that they relied upon the representations of Apache both before and after they elected to participate pursuant to the pooling order. They claimed that the representations amounted to promises they would receive the earned acreage. They claimed such representations were consistent with industry custom and usage that as working interest owners they would receive a proportionate share of the earned acreage. They testified that they were induced to participate because of representations (promises), and that they were damaged by Apache not performing in accordance with those promises. Their evidence was that they justifiably relied upon the representations made by Apache under the circumstances. The jury agreed. I conclude that in the circumstance of a private contract dispute between working interest owners a promise may be formed by words, conduct, or a combination of the two. Restatement (Second) Contracts § 2. I would thus reject the assignments of error challenging the sufficiency of the evidence. I would also reject the claimed error based upon jury instructions on this issue.
¶ 12 The trial court awarded Plaintiffs prejudgment interest at the rate of 12% per annum, compounded from the date of first production in 1981. It also awarded attorney's fees. It stated its reliance upon 52 O.S. § 570.10(D, E) (1993) for both awards. Plaintiffs did not invoke that section until after trial. Interest awarded pursuant to that section is part of the cause of action authorized therein. See Fleet v. Sanguine, Ltd., 1993 OK 76, 854 P.2d 892, 900. A new cause of action is not properly raised for the first time after trial in an attempt to increase the judgment.
¶ 13 The trial court also relied on 12 O.S. § 936 in its award of attorney fees. That section refers to an account based upon running or concurrent dealings. Nicholson v. Thixton, 448 P.2d 454, 455 (Okla.1968). The damages sought and obtained in this case are not based on an account, but represent revenues that would have been paid to Plaintiffs had Apache assigned to them the acreage.
¶ 14 In sum, I would affirm the judgment on the jury verdict and the award of acreage. However, I would reverse the award of attorney's fees and interest. The finding that the acreage awarded was balanced for oil and gas balancing purposes was beyond the pleadings and evidence presented, and I would thus reverse it as well.
NOTES
[1] An "AFE" or Authority for Expenditure, or Authorization for Expenditure, is an authorization for expenditures for the well. LPCX Corp. v. Faulkner, 1991 OK 46, 818 P.2d 431, 433; Kaneb Production Co. v. GHK Exploration Co., 1989 OK 11, 769 P.2d 1388, 1390.
[2] Section 90: Promise Reasonably Inducing Action or Forbearance

(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by the enforcement of the promise. The remedy granted for breach may be limited as justice requires. (2) A charitable subscription or a marriage settlement is binding under Subsection (1) without proof that the promise induced action or forbearance.
[3] Section 2: Promise; Promisor; Promisee; Beneficiary

(1) A promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made.
(2) The person manifesting the intention is the promisor.
(3) The person to whom the manifestation is addressed is the promisee.
(4) Where performance will benefit a person other than the promisee, that person is a beneficiary.
[4] Section 106 has not changed since the time of the communications and pooling and it provides:

"Any benefit conferred, or agreed to be conferred upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered or agreed to be suffered by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is a good consideration for a promise."