[No. 37756-6-I.    Division One.    October 13, 1997.]

JOEL DOUGLAS, ET AL., *Appellants*, v. RONALD T. JEPSON, ET AL., *Respondents*.

---

[41]RCW 9.94A.120(6)(b).

[42]RCW 9.94A.120(6)(c).

[43]86 Wn. App. 546.

[44]Former RCW 9.94A.030(36)(b) (now RCW 9.94A.185).

*Dean G. von Kallenbach* of *Camp von Kallenbach, Ltd.*; and *Richard F. Banel*, for appellants.

*William B. Owens*; and *Philip J. Buri* of *Brett & Daugert, Attorneys at Law, L.L.P.*, for respondents.

ELLINGTON, J. — Joel Douglas and Ronald Jepson held property together for many years as tenants in common. After receiving an offer to buy the whole property, Douglas purchased Jepson's interest without disclosing the third-party offer. We are asked to consider whether the summary judgment order entered in favor of Jepson should be reversed because a question of fact exists as to whether Douglas had a duty to disclose the third-party offer. We reverse and remand for trial because the parties' cotenant relationship does not by itself impose a duty of disclosure. Whether such a duty exists depends on a question of fact, namely, whether the parties were engaged in a joint venture to sell the property.

## FACTS

In 1975, Douglas, with his wife Barbara, purchased 15 acres of real estate for commercial development as tenants in common with Jepson and his then wife, Claire. This real estate was then improved and zoned for commercial development.

In 1991, the property was divided into three parcels, Lots A, B, and C. Shortly thereafter, Claire, now Jepson's

ex-wife, exchanged her interest in Lots B and C for Jepson's interest in Lot A. Claire and the Douglases then sold Lot A to HCWA Realty Corporation, a/k/a "Home Club." Thus, Lot A was now owned by Home Club and Lots B and C were jointly owned among the Douglases[1] and Jepson as tenants in common.

Lots B and C are located between the Home Club lot and an access street. To provide ingress and egress between the Home Club store and the street, and to enhance the value of Lots B and C, reciprocal easement agreements were executed. These agreements held Jepson and Douglas liable to Home Club for the costs of filling, leveling, and paving Lots B and C. These costs were estimated at $415,000, but proved to be $1.1 million. Unknown to Douglas, Home Club hired Jepson as the supervising engineer on this project. As the costs of these improvements greatly exceeded expectations, Douglas visited the site with Jepson and discovered that a contractor was "shorting its loads." Douglas maintains that at this point Jepson still did not reveal that he was the supervising engineer of the project.

Douglas sued Home Club and Jepson over who was responsible for the cost overruns. This dispute was settled in arbitration, with Jepson held liable for significantly more of the overruns than Douglas. The settlement occurred in October 1993. Douglas and Jepson have not spoken since. Sometime before they stopped speaking, the parties had placed a "for sale" sign on the property. The sign listed both Douglas and Jepson's phone numbers and remained posted on the land for all times pertinent to this appeal.

In November, 1993, Jepson and Douglas sold Lot B to Toys 'R Us. This deal had been pending for more than two years. Because Jepson and Douglas were not speaking,

---

[1]From this point forward, neither Barbara nor Claire is alleged to have taken any substantive action in the development or sale of the properties. Therefore, we will hereafter refer to the Douglases as Douglas to enhance readability.

communications between them were made through Douglas' attorney, Roland Balloun. On January 5, 1994, Terranomics Retail Services, on behalf of the electronic store, "The Good Guys," contacted Douglas to express an interest in buying Lot C for $1.2 million. On that same day, Douglas negotiated to buy Jepson's interest in the property. Jepson ultimately accepted Douglas' offer of $450,000 because he "needed the money to purchase other property that [he] was interested in." Balloun negotiated this sale on behalf of Douglas.

Douglas never disclosed to Jepson that the Good Guys were interested in the property. Douglas testified that he did not want Jepson involved in the Good Guys deal because Jepson had frustrated similar negotiations in the past. The deal was finalized approximately five months after Jepson sold his interest to Douglas.

In November, 1994, Douglas filed this action, seeking a declaratory ruling as to whether Jepson was entitled to certain moneys based on their previous business dealings. Jepson counterclaimed for damages, contending that Douglas had breached a fiduciary duty by failing to disclose the Good Guys' offer.

Jepson moved for summary judgment on his claim that Douglas had breached a fiduciary duty by failing to disclose the Good Guys' offer. To support his position that he and Douglas had a partnership, Jepson produced several documents in which Douglas either purports to speak on behalf of the other cotenants or on behalf of a partnership. The most recent of these documents bears a date from 1991.

Douglas denied that a partnership ever existed, and testified that although he and Jepson contemplated forming a partnership, this idea was rejected on three separate occasions. To support his theory that no partnership existed, Douglas noted that Jepson was routinely late with his mortgage payments, and despite the fact that these late payments put the property at risk of foreclosure, Douglas never made any payments for Jepson. Douglas also noted that he had not spoken to Jepson since October 1993.

The court granted Jepson's summary judgment motion, stating that "the facts that are uncontroverted in this case satisf[y] the court that the parties to this lawsuit entered upon a joint venture" and that Douglas "clear[ly] violat[ed] his obligation to deal in good faith and in an honest fashion with his partner[.]"

## DISCUSSION
### Summary Judgment

■ Summary judgment is proper only if there are no issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). When reviewing a summary judgment order, this court engages in the same inquiry as the trial court and considers only evidence and issues raised below. *Washington Fed'n of State Employees, Council 28 v. Office of Fin. Mgmnt.*, 121 Wn.2d 152, 156-57, 849 P.2d 1201 (1993); RAP 9.12. When reasonable minds could reach but one conclusion, questions of fact can be decided as matters of law. *See, e.g., Allen v. State*, 118 Wn.2d 753, 760, 826 P.2d 200 (1992). Facts must be considered in the light most favorable to the nonmoving party. *See, e.g., Malnar v. Carlson*, 128 Wn.2d 521, 534-35, 910 P.2d 455 (1996).

■ The trial court found that Douglas breached his obligation to deal with his partner Jepson in good faith. Whether a partnership exists depends on the intention of the parties, which is ascertained by examining all of the facts and circumstances, including the parties' actions and conduct. *Malnar*, 128 Wn.2d at 535. For example, in *Malnar*, the parties disputed whether they entered into a partnership for the purchase, sale, and development of a piece of land. The court noted that although the parties had entered into similar partnerships in the past, the issue of whether a partnership existed as to the development of the property in question could not be decided on summary judgment because the nonmoving party declared under oath that no partnership agreement existed. *Malnar*, 128 Wn.2d at 524-25, 536.

Like the defendant in *Malnar*, Douglas declared under

oath that no partnership existed. In fact, he testified that the parties explicitly rejected such an arrangement. Moreover, even if a partnership existed at one time, Douglas has raised a question of fact as to whether one still existed at the time he received the Good Guys' offer. By that time, Douglas had sued Jepson and had not talked to him for three months.

The trial court relied on correspondence in which Douglas referred to himself and Jepson as partners. This correspondence, however, terminated in 1991, approximately two years before the Home Club suit that created animosity between Douglas and Jepson. The trial court also relied on the existence of the sign advertising the availability of the property, which listed both Douglas's and Jepson's phone numbers. This too cannot be construed as conclusive evidence that a partnership existed in 1994 because the sign was erected before the animosity developed. Various inferences are thus reasonable, such as that the failure to remove the sign was merely an oversight, or that removal was unnecessary because the sign listed the parties' two separate numbers and not a single partnership number. Conversely, one could conclude that the sign evidences a continuing joint venture. Whether a partnership existed is a question of fact.

■■ Jepson maintains that a breach of duty can be found as a matter of law by virtue of the tenancy in common with Douglas. When parties share property as tenants in common, each cotenant's title is separate and distinct, and can be transferred and encumbered without the consent or knowledge of the other cotenants. *Clallam County v. Folk*, 130 Wn.2d 142, 148-49, 922 P.2d 73 (1996). While some circumstances may create a quasi-fiduciary relationship, the full array of fiduciary rights and obligations does not exist among cotenants merely because of their property relationship. *See generally*, 1 WASHINGTON STATE BAR ASS'N, WASHINGTON REAL PROPERTY DESKBOOK § 6.5 at 6-4 (2d. ed. 1986).

Jepson argues that one of the obligations imposed on cotenants by Washington law is a duty of disclosure. He is

correct that a duty of disclosure can exist where the parties agreed to a particular undertaking, or where one cotenant attempts to take an inequitable advantage of another cotenant. *See Cummings v. Anderson*, 94 Wn.2d 135, 143 n.3, 614 P.2d 1283 (1980).

An illustration of an agreement to a singular undertaking is found in *Briggle v. Cox*, 72 Wash. 574, 131 P. 209 (1913). In that case, the court recognized that joint tenants have the right to sell their interests to anyone at any time without consulting the other property owners. The Court noted, however, that such a right could not be invoked to allow one of the cotenants to reap a secret profit where all of the cotenants agreed to sell their property together. *Briggle*, 72 Wash. at 575, 578-79. Critical to the *Briggle* holding is that the parties agreed to sell their property as a whole. Thus, although not explicitly stated, the duty found in *Briggle* arose from the parties' partnership, not from their mere status as tenants in common.

A cotenant was estopped from taking inequitable advantage of another cotenant in *Woodard v. Carpenter*, 31 Wn.2d 271, 273, 195 P.2d 983 (1948). Two cotenants owned several parcels that were later partitioned. During the cotenancy, however, neither cotenant paid certain tax assessments. After the cotenancy had been terminated, the first cotenant received notice of the delinquency and purchased the property at a foreclosure sale, thereby acquiring property that had been partitioned to the second cotenant. Because the first cotenant never forwarded the delinquency notice, the second cotenant was not timely apprised of the foreclosure. The court refused to allow the sale to prejudice the second cotenant. Instead, the court noted that cotenants have a duty to keep the property free of encumbrances and held that equitable principles did not permit the first cotenant to gain title by virtue of her failure to pay taxes. In reaching this result, the court observed that the taxes burdened the property as a whole, not merely the individual cotenant estates. *Woodard*, 31 Wn.2d at 271-75.

*Woodard* is inapplicable here. There is no violation of a cotenant's clear duty such as the duty to keep the land free from encumbrances. Neither statute nor common law imposes a per se duty of disclosure upon cotenants. Indeed, routinely imposing such a duty could prove unworkable. One cotenant may not even know who other cotenants are. Absent an agreement to sell the property together, there is no duty of disclosure. *See Briggle*, 72 Wash. at 575, 578-79; *Malnar*, 128 Wn.2d at 535-36. Because there is a question of fact as to whether the parties had an agreement that triggered a duty of disclosure, we remand for trial.

The remainder of this opinion has no precedential value and will not be published. It will be filed for the public record pursuant to RCW 2.06.040.

KENNEDY, A.C.J., and GROSSE, J., concur.

Review denied at 134 Wn.2d 1026 (1998).