IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| ARMAND DeFELICE, | ) | No. 32382-0-III |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF WASHINGTON, | ) | PUBLISHED OPINION |
| EMPLOYMENT SECURITY | ) | |
| DEPARTMENT, | ) | |
| | ) | |
| Respondent. | ) | |

BROWN, J. – Dr. Armand DeFelice[1] appeals the Employment Security Department

Commissioner's decision affirming an order and notice of assessment requiring Dr.

Armand to pay $1,896.37 in unemployment insurance back taxes, penalties, and

interest. Dr. Armand contends the commissioner erred when it found Drs. Loretta and

Louise were in his employment and not partners excluded under the Employment

Security Act. Because substantial evidence supports the commissioner's factual

findings and the conclusions of law are consistent, we affirm the commissioner's

decision and deny Dr. Armand's attorney fees request.

FACTS

---

[1] This appeal concerns Dr. Armand DeFelice and his family members, Dr.
Loretta DeFelice and Dr. Louise DeFelice. Because they share the same last name,
they are referred to as Dr. Armand, Dr. Loretta, and Dr. Louise for clarity.

## FACTS

In 1966, Dr. Armand began a dental practice and registered it as a sole proprietorship. On February 1, 1990, Dr. Armand entered into an association agreement with Dr. Loretta. On January 2, 2004, Dr. Armand entered into another association agreement with Dr. Louise. Both association agreements provided that Dr. Armand "agrees to have Associate associate with him for the purpose of practicing dentistry on [Dr. Armand's] patients." Admin. Record (AR) at 241, 247. The association agreements specifically stated all dentists "agreed that the doctors are not partners." AR at 241, 247. The association agreements provided for the manner of termination.

The association agreements specified each dentist's responsibilities. While each dentist remained responsible for determining how much to charge for their respective services, charges were billed under Dr. Armand's name and payments were deposited into his account. In addition, Dr. Armand had to provide necessary facilities and equipment and pay the rent and all expenses. Both Drs. Loretta and Louise received 35 percent of the fees they produced. This amount later increased to 40 percent.

In 2012, after it was discovered Dr. Armand was not paying unemployment insurance taxes, the Employment Security Department (the Department) audited the dental practice to determine whether the dental practice had to pay back taxes, penalties, and interest. Thus, the principal focus of the audit was to ascertain whether Drs. Loretta and Louise were employees of Dr. Armand's dental practice. The audit covered the years 2010, 2011, and the first quarter of 2012.

2

The auditor, Angela Hughes, reviewed various tax returns, quarterly and annual reports, check registers, and general ledger accounts. Ms. Hughes requested any agreements between the dentists; the dental practice's bookkeeper complied. Ms. Hughes never asked if the association agreements were still valid and enforceable. Ms. Hughes' review revealed (1) the dental practice was registered as a sole proprietorship with both the Department and the Washington Department of Revenue, (2) Dr. Armand listed the dental practice on his tax returns as a sole proprietorship, and (3) payments made to Drs. Loretta and Louise were reported as miscellaneous income on Internal Revenue Service (IRS) Form 1099s.[2] She concluded Drs. Loretta and Louise were employees of the dental practice and unemployment insurance taxes should have been paid. The Department issued Dr. Armand an order and notice of assessment requiring him to pay $1,896.37 in back taxes, penalties, and interest. Dr. Armand first administratively appealed.

At the administrative hearing, Dr. Armand testified the association agreements were no longer valid as the three dentists had orally entered into a partnership. He stated Drs. Loretta and Louise receive 40 percent of their production, their share of the dental practice's profits. The remaining 60 percent of production is applied to overhead. Dr. Armand then took home what was left after overhead was paid, which he claimed was about 40 percent of his production.

---

[2] In 2013, the dental practice formed and registered a professional limited liability company (PLLC).

3

The administrative law judge (ALJ) concluded Drs. Loretta and Louise were employees of the dental practice and affirmed. Dr. Armand petitioned the Department's commissioner for review of the ALJ's decision; the commissioner adopted the ALJ's findings of fact and conclusions of law and affirmed the ALJ. Dr. Armand sought superior court review. The superior court affirmed, finding substantial evidence supported the commissioner's decision. Dr. Armand appealed.

ANALYSIS

The issue is whether the Department's commissioner erred in deciding Dr. Loretta and Dr. Louise were "in employment" under Washington's Employment Security Act as found by the ALJ and approving the order to pay unemployment insurance back taxes, penalties, and interest. Dr. Armand contends Drs. Loretta and Louise are his partners, and thus, he argues, they are not in his employment.

Because unemployment taxes "exist to aid a class of people that society has chosen to protect," an employer's claim of exemption is closely scrutinized. *W. Ports Transp., Inc. v. Emp't Sec. Dep't*, 110 Wn. App. 440, 451, 41 P.3d 510 (2002). The Administrative Procedure Act (APA), ch. 34.05 RCW, governs judicial review of a final decision of the Employment Security Department Commissioner. *Tapper v. Emp't Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993). "The [ ]APA allows a reviewing court to reverse an administrative decision when, *inter alia*: (1) the administrative decision is based on an error of law; (2) the decision is not based on substantial evidence; or (3) the decision is arbitrary or capricious." *Id.* (citing RCW 34.05.570(3)).

4

We sit in the same position as the superior court, applying APA standards directly to the agency record. *Id.; see* RCW 34.05.558. While we review the commissioner's decision, when the commissioner adopts the ALJ's findings and conclusions, we review the underlying ALJ findings and conclusions supporting the decision. *Smith v. Emp't Sec. Dep't*, 155 Wn. App. 24, 32, 226 P.3d 263 (2010); *Tapper*, 122 Wn.2d at 406. The commissioner's decision is considered prima facie correct. *Smith*, 155 Wn. App. at 32. The burden of demonstrating the decision's invalidity is on the party asserting invalidity. *W. Ports Transp., Inc.*, 110 Wn. App. at 449.

"We review questions of law de novo, giving substantial weight to the agency's interpretation of the statutes it administers." *Smith*, 155 Wn. App. at 32. The commissioner's findings of fact are reviewed for substantial evidence in light of the whole record. *Id.* "'Substantial evidence' is evidence that would persuade a fair-minded person of the truth or correctness of the matter." *Id.* at 32-33. We defer to factual decisions, with the evidence viewed in the light most favorable to the party who prevailed in the highest forum that exercised fact-finding authority; here, the Department. *William Dickson Co. v. Puget Sound Air Pollution Control Agency*, 81 Wn. App. 403, 411, 914 P.2d 750 (1996). As such, we "will not substitute [our] judgment on witnesses' credibility or the weight to be given conflicting evidence." *W. Ports Transp., Inc.*, 110 Wn. App. at 449. "When reviewing mixed questions of law and fact, [appellate courts] accept the [c]ommissioner's unchallenged factual findings, apply the substantial

evidence standard to the challenged findings of fact, independently determine the applicable law, and apply the law to the facts." *Id.* at 450 (stating application of law to facts is de novo). An agency's decision is arbitrary and capricious if the decision is "willfully unreasonable, without consideration and in disregard of facts or circumstances." *Id.* It is not arbitrary and capricious if the decision is "exercised honestly and upon due consideration, even where there is room for two opinions." *Id.*

Dr. Armand incorrectly contends the evidence solely shows a partnership existed between him and Drs. Loretta and Louise. In determining whether an employer is responsible for contributions to the unemployment fund, the first question is whether an individual is in "'employment.'" *Penick v. Emp't Sec. Dep't*, 82 Wn. App. 30, 38, 917 P.2d 136 (1996). "Employment" is defined as "personal service, of whatever nature, unlimited by the relationship of master and servant as known to the common law or any other legal relationship, . . . performed for wages or under any contract calling for performance of personal services, written or oral, express or implied." RCW 50.04.100. If Drs. Loretta and Louise were partners, they would not be in "employment" as defined by the Employment Security Act.

"[T]he association of two or more persons to carry on as co-owners a business for profit forms a partnership." RCW 25.05.055(1). Required is joint ownership of the business and a joint right of control over the business' affairs. *Bengston v. Shain*, 42 Wn.2d 404, 409, 255 P.2d 892 (1953). "A person who receives a share of the profits of a business is presumed to be a partner in the business, unless the profits were received

6

in payment" as wages to an employee. RCW 25.05.055(3)(c)(ii); *see also Bengston*, 42 Wn.2d at 409 ("The mere sharing of the net proceeds of a business venture with an employee, without more, does not of itself convert the relationship between the parties concerned into a partnership.").

The burden of proving a partnership is on the party asserting its existence. *Bengston*, 42 Wn.2d at 409. Just because the parties call their arrangement a partnership does not make it a partnership. *State v. Bartley*, 18 Wn.2d 477, 481, 139 P.2d 638 (1943). Essential to the creation of a partnership is an express or implied partnership contract. *Eder v. Reddick*, 46 Wn.2d 41, 49, 278 P.2d 361 (1955). Whether a partnership contract exists depends on the parties' intentions, manifested by all facts and circumstances, including the parties' actions and conduct. *Bartley*, 18 Wn.2d at 482; *see also Douglas v. Jepson*, 88 Wn. App. 342, 347, 945 P.2d 244 (1997). While a partnership's existence can be established by circumstantial evidence, "circumstantial evidence does not tend to prove the existence of a partnership unless it is inconsistent with any other theory." *Eder*, 46 Wn.2d at 49. Another important test in determining whether a partnership is formed is sharing losses. *Gottlieb Bros. v. Culbertson's*, 152 Wn. 205, 209, 277 P. 447 (1929); *see also Bengston*, 42 Wn.2d at 409 ("A partnership is formed by agreement to place money, effects, labor and skill . . . in a lawful business and to divide the profits and bear the losses in certain proportions.").

Dr. Armand challenges 16 of the commissioner's findings of fact and four

conclusions of law.[3] The majority of Dr. Armand's error assignments involve disputes

with the commissioner's findings regarding the association agreements. He argues the

association agreements were orally modified and/or revoked and a partnership formed.

But the record contains other facts that do not support his argument.

In 1966, Dr. Armand registered his dental practice as a sole proprietorship with

the Department and the Washington Department of Revenue. In 1990, Dr. Armand and

Dr. Loretta entered into an association agreement which specifically stated Dr. Loretta

was not a partner. In 2004, Dr. Armand and Dr. Louise entered into a substantially

similar association agreement which again explicitly stated Dr. Louise was not a partner.

These association agreements provided for each of the dentist's responsibilities,

providing for the manner of termination in paragraphs seven and eight.[4] However,

terminable-at-will contracts[5] may be unilaterally modified provided reasonable notice is

given; once given, the old contract is effectively displaced. *See Duncan v. Alaska USA

Fed. Credit Union, Inc.*, 148 Wn. App. 52, 76-78, 199 P.3d 991 (2008).

The commissioner, by adopting the ALJ's findings and conclusions, found the

association agreements remained effective and rejected Dr. Armand's partnership

---

[3] Dr. Armand assigns error to the following findings of fact: 1-14, 16, and 17. He assigns error to the following conclusions of law: 6, 7, 8, and 11.

[4] These paragraphs provide the association agreement could be terminated upon 30 days' notice by either party or in the event of incapacity.

[5] A terminable-at-will employment relationship is one where the employment is of indefinite duration and may be terminated at any time, with or without cause, by either the employer or the employee. *Quedado v. Boeing Co.*, 168 Wn. App. 363, 367, 276 P.3d 365, *review denied*, 175 Wn.2d 1011 (2012).

8

claims. We do not reexamine evidence weight and witness credibility determinations on review. Sufficient evidence supports the commissioner's determinations. Calling a business arrangement a partnership does not make it a partnership. For example, Dr. Armand continued to retain control over billing patients. For income, Dr. Armand received whatever was left over after he paid Drs. Loretta and Louise their 40 percent of production and overhead expenses. Dr. Armand argues there is equal sharing of profits because he too received 40 percent of his production. But his share is calculated differently than Drs. Loretta and Louise and is not exact. Drs. Loretta and Louise did not share losses. Drs. Loretta and Louise always took home 40 percent of their production regardless of whether the patients actually paid their bills.

Notably, the dental practice registration remained unchanged with the Department and the Washington Department of Revenue. If Drs. Loretta and Louise were considered partners, they would have had an account at the Department because the Department requires employers to report changes in owners and partners at the same time the quarterly tax and wage report is due. WAC 192-310-010(2)(a). The Washington Department of Revenue requires an owner to obtain new registration and license documents when there is a change in ownership. WAC 458-20-101(11)(a)(iii) (stating a change in ownership occurs with the "addition of one or more partners where the general partnership continues as a business organization and the change in the composition of the partners is equal to or greater than fifty percent"). Instead, Dr. Armand continued to report the income and expenses of the dental practice on his

9

individual income tax return as a sole proprietorship. Dr. Armand continued to report payments made to Drs. Loretta and Louise as miscellaneous income on Form 1099s.

Regarding the failure to file an IRS Form 1065, the commissioner used that failure as cumulative circumstantial evidence not showing a partnership. While Dr. Armand and the commissioner debate filing requirements, we note the penalty, not the filing requirement, may be waived for small partnerships. Rev. Proc. 84-35, 1984-1 C.B. 509. In light of the other circumstantial evidence demonstrating a partnership was not in existence, the issue of the failure to file a Form 1065 is not critical.

Dr. Armand argues the commissioner disregarded certain evidence tending to show a partnership existed. First, he points to his testimony at the administrative hearing regarding ownership of equipment where he stated the equipment is owned by all of the dentists. No documentation supported this assertion, and the commissioner was entitled to weigh its credibility. We do not re-weigh the credibility of witnesses. *W. Ports Transp., Inc.*, 110 Wn. App. at 449. Second, he discusses the discretion and control Drs. Loretta and Louise exercised in caring for their patients. While control is relevant in establishing a partnership, doctors who are employees exercise control in treating their patients; professional discretion is an essential element of being a doctor. Third, he points to Dr. Louise's membership in the family limited liability company that owns the building where the dental practice leases space. But this is irrelevant to whether she is a partner in the dental practice. Fourth, Dr. Armand argues Ms. Hughes' failure to ask if the association agreements were still valid demonstrates bias. But the

10

commissioner apparently found her process testimony more credible. Fifth, Dr. Armand argues the 40 percent production payments to Drs. Loretta and Louise show the association agreements were terminated, however, these could be explained as contract modifications. Sixth, while the creation of the PLLC in January 2013 and individual maintenance of insurance may tend to show the existence of a partnership, this circumstantial evidence is inconsistent with other evidence.

Given our analysis, we conclude the commissioner's findings of fact are supported by substantial evidence. Next, we conclude the commissioner's conclusions of law rejecting a partnership and deciding Drs. Loretta and Louise were in employment are supported by the findings of fact.

Drs. Loretta and Louise must be in "employment" in order to for Dr. Armand to be covered by the Employment Security Act. RCW 50.04.100. "'[E]mployment' exists if (1) the worker performs personal services for the alleged employer, and (2) if the employer pays wages for those services (or pays under any contract calling for personal services)." *W. Ports Transp., Inc.*, 110 Wn. App. at 451.

To meet the first prong of this test, "the personal services must clearly be performed for the alleged employer or for its benefit." *Language Connection, LLC v. Emp't Sec. Dep't*, 149 Wn. App. 575, 582, 205 P.3d 924 (2009). Dr. Armand's dental practice requires dentists in order to perform dental services. Drs. Loretta and Louise provided such services for Dr. Armand's benefit. Thus, Drs. Loretta and Louise performed personal services for Dr. Armand.

11

For the second prong, the contract called for the performance of personal services with Drs. Loretta and Louise receiving remuneration from Dr. Armand. "'Wages'" are "remuneration paid by one employer during any calendar year to an individual in its employment." RCW 50.04.320(1). "'Remuneration'" includes "all compensation paid for personal services." RCW 50.04.320(4). The money collected from the dental practice's patients was collected by Dr. Armand and deposited into Dr. Armand's account. Dr. Armand then paid Drs. Loretta and Louise out of this account. Drs. Loretta and Louise did not receive their payment when they finished a procedure. *See Penick*, 82 Wn. App. at 41 (holding employer paid wages when he collected payment from customers without evidence of separate accounts between sole proprietor and his employees and employees did not receive payment when a transaction closed but bi-weekly).

## CONCLUSION

We hold the Department's commissioner, by adopting the ALJ's findings of fact and conclusions of law, correctly decided Dr. Loretta and Dr. Louise were covered employees under Washington's Employment Security Act. Because Dr. Armand does not argue Drs. Loretta and Louise were independent contractors, we do not address the Department's briefing on that subject. Finally, considering our holding, we do not reach

12

No. 32382-0-III
*DeFelice v. Emp't Sec. Dep't*

Dr. Armand's attorney fee requests because the Department prevails.

Affirmed.

_____
Brown, J.

I CONCUR:

_____
Korsmo, J.

No. 32382-0-III

SIDDOWAY, C.J. (dissenting) — The initial decision of the administrative law judge (ALJ) in this matter, which the commissioner of the Department of Employment Security adopted and the Superior Court then affirmed, was not based on the ALJ's resolution of factual disputes. It was based on four legal conclusions urged by the department: (1) that the written employment agreements entered into at the time Dr. Armand DeFelice's daughters joined his practice could not be replaced years later by a partnership relationship without terminating the employment agreements in writing; (2) that the Washington revised Uniform Limited Partnership Act (RUPA), chapter 25.05 RCW, mandates precisely equal profit sharing among partners; (3) that the RUPA mandates an agreement to share all losses equally; and (4) that the conduct of business by three professionals in a form other than a partnership, standing alone, supports the conclusion that they are not partners.

The four legal conclusions were in error, and under the Administrative Procedure Act, a court shall grant relief from an agency order in an adjudicative proceeding if it determines that the agency has erroneously interpreted or applied the law. RCW 34.05.570(3)(d). The decision of the commissioner should be reversed.

*The Department of Employment Security's assessment was based on form, not substance.*

Department tax specialist Angela Hughes assumed upon beginning her audit of the DeFelice Dentistry practice that it was a sole proprietorship because Dr. Armand

DeFelice (whom I will refer to hereafter as "Dr. Armand" for purposes of clarity, as the majority does[1]) was registered with the department as a sole proprietor doing business as Armand V. DeFelice DDS. Administrative Record (AR) at 222. He reported federal income and other taxes on the same basis. At the outset of the audit, and armed with three forms 1099 that Dr. Armand had filed with his federal tax return, Ms. Hughes asked the dental practice's bookkeeper for any written agreements with recipients of the forms 1099. She was provided with association agreements that Drs. Loretta and Louise had signed with their father upon joining his practice in 1990 and 2004, respectively. She was also provided with an agreement with a janitorial service that proved to Ms. Hughes' satisfaction to be an independent contracting relationship. Ms. Hughes admitted that she never asked, and was never told, whether the association agreements from the practice files were in effect at the time of her June 2012 audit.

Because Ms. Hughes never considered the possibility that the dentists had begun operating as a partnership, she spoke only briefly with Dr. Armand, characterizing her conversation with him as a casual, "[H]ere is what I found, this is what is happening, this is what is next." AR at 112. Dr. Armand agrees that to the best of his recollection, Ms. Hughes did not ask him any questions. *Id.* at 131. Ms. Hughes spoke with only one of

---

[1] Like the majority, I will likewise refer to Dr. Armand's daughters and co-partners as "Dr. Loretta" and "Dr. Louise."

2

the women dentists—and so passingly that not only did she make no notes of the conversation, she couldn't even remember whether she spoke to Dr. Loretta or Dr. Louise. *Id.* Dr. Louise testified that Ms. Hughes never spoke with her. AR at 155.

Ms. Hughes therefore had no occasion to ask anyone about which dentists made decisions about operations, whether individual dentists had their own patients, whether the dentists shared profits, or other business or financial matters relevant to operation as a partnership. Although DeFelice Dentistry had some employees and filed reports and paid unemployment insurance taxes, Ms. Hughes evidently never asked why the dental practice was paying employment taxes with respect to some of its employees but not with respect to Drs. Loretta and Louise.

When the lawyer for DeFelice Dentistry was informed that Ms. Hughes had concluded that an assessment of contributions, interest and penalties against Dr. Armand dba Armand V. DeFelice DDS was in order based on his asserted employment of Drs. Loretta and Louise, the lawyer asked Ms. Hughes if there could be an exit interview in order to explain why an assessment would be in error. Ms. Hughes declined, stating that Dr. Armand could appeal. While Ms. Hughes was entitled to close her audit without granting further interviews, the result was that the department did not have any occasion to further inquire about the substance of the dentists' business relationship before the appeal hearing.

3

Dr. Armand did appeal. In his prehearing memorandum filed three months before the administrative hearing, he characterized the association agreements as "ancient document[s]," stated that the relationship between the dentists had been amended orally before the audit period as "can be established by a quick review of the Income Statement," and stated that by the time of the audit period, the dentists "are in fact partners." AR at 259.

One might infer from the majority's opinion that the department then developed and presented evidence at the hearing relevant to the substance of the dentists' business relationship during the audit period, so that the ALJ's task was to determine whose evidence about the actual dental practice operations, financial and otherwise, was worthy of belief. But at the time of the administrative hearing, the department did not offer evidence on the substance of the dentists' relationship. It called only one witness—Ms. Hughes, who knew nothing about actual practice operations during the audit period. In an examination in the department's opening case that comprises only eight pages of the administrative record (the department's rebuttal case is reflected on an additional two pages), the department presented Ms. Hughes' evidence on the only two facts it viewed as mattering: (1) Dr. Armand was registered with and reported to several agencies as a sole proprietorship, and (2) Ms. Hughes was given two association agreements for Drs. Loretta and Louise, dated 1990 and 2004, respectively, that the department argued were

4

required by their terms to be terminated in writing, but never were. *See* AR at 102–09,

125 (department examination in opening case); AR at 83-84 (rebuttal evidence).

Dr. Armand's defense case was itself not long, although longer than the

department's. At issue, after all, was only a $1,869 assessment. AR at 222. Through Dr.

Armand's petition for review, his testimony and that of Dr. Louise, and the cross-

examination of Ms. Hughes, Dr. Armand presented evidence and argument on the

following matters:

- That Ms. Hughes never asked whether the association agreements were in effect during the audit period and was never told by any representative of the practice that they were (AR at 108, 112–13);

- That the dental practice had evolved into a partnership; according to Dr. Louise, this was in or about 2008 (AR at 73-74, 78-79, 86-87);

- That based on the practice's operating overhead of 60 percent of total collected revenues, the three dentists had arrived at a profit sharing arrangement designed to distribute to each dentist a 40 percent profit on his or her production, although Drs. Loretta and Dr. Louise took distribution checks based on a flat 40 percent profit, while Dr. Armand agreed to assume the benefit or burden of a somewhat higher or lower percentage (depending on whether the overhead proved to be a lower or higher percentage of total collected revenues) (AR at 156-57, 159);

- That based on the daughters' 40 percent profit sharing distribution established at the hearing, one could determine by analyzing the income statements that Dr. Armand had received a similar share of the profits (AR at 36-37);

- That Dr. Armand did not control the work of his daughters, who were experienced and successful professionals and together produced

5

approximately 63 percent of the total production of the practice in 2010 (AR at 119-20, 163-64)[2];

- o That "the practice"—meaning the three dentists, as partners—owned the equipment of the practice and operated its business (AR at 145-47);

- o That each dentist had his or her own patients (AR at 71-73; 156); and

- o That the home page of the practice website for DeFelice Dentistry characterized the practice in partnership terms, stating that "Dr. <u>Armand DeFelice</u>, Dr. <u>Lorrie Rosier</u> and Dr. <u>Louise DeFelice</u> work together as a team to provide you with the highest standard of dental care available." (AR at 207, 230)

The department cross-examined Dr. Armand and Dr. Louise about the profit-sharing arrangement. The ALJ also asked a number of questions. The department's lawyer elicited Dr. Louise's agreement that under the dentists' distribution arrangement, if Dr. Louise hypothetically did not work for a month, then she would not contribute towards that month's overhead. AR at 159-60.

In rendering its decision following the hearing, the ALJ did not make a factual finding as to whether the dentists had or had not orally agreed to begin operating as partners sometime before 2010. The department had not thought it mattered; its position was and remains that because the dentists admit that they never terminated the association agreements in writing then the agreements were not terminated, period. The

---

[2] The evidence at the hearing was in dollar terms; I substitute percentages out of respect for the dentists' financial privacy. By the same analysis, Drs. Loretta and Louise together produced approximately 64 percent of the total production in 2011. *See* AR at 234.

6

ALJ adopted the department's position and, on that basis, relied upon association agreements that it treated as continuing to control as a matter of law, not fact, for a dozen findings. *See* AR at 292-94 (findings 1-12).

The department responded to testimony and financial record evidence that Drs. Loretta and Louise indisputably collected a 40 percent profit from their production during the audit period (an amount inconsistent with the association agreements) by taking the position that it is not "profit sharing" if partners agree that some of them will take distributions based on projected profit while others will assume the risk that the actual profit might be higher or lower than projected. The ALJ implicitly adopted the department's position. AR at 296 (conclusion 7).

The department also took the position that partners are required to share losses. It took the position that partners are not sharing losses if there is a conceivable, even if implausible scenario under which one partner alone could incur a loss. The ALJ implicitly adopted that position. *See id.*

Finally, the department took the position that the sole proprietorship form in which Dr. Armand had reported and registered with it and other agencies was sufficient, standing alone, to support the conclusion that the dentists were not operating as a partnership. The ALJ adopted that position. *See id.*

Each of these conclusions was wrong as a matter of law.

7

*Partner services are not employment.*

There is no employer-employee relationship when an owner provides services to a business. Accordingly, partners of a partnership are not covered for unemployment insurance purposes. WAC 192-300-190; RCW 50.40.100. While the department argues that a party claiming an exemption from taxation bears the burden of proof (*see* Br. of Resp't at 13), DeFelice Dentistry does not rely on an exemption but on its position that an owner's services are not "employment" under the Employment Security Act.

A partnership is an association of two or more persons to carry on as co-owners a business for profit; in Washington, at the time Drs. Armand, Loretta and Louise testify they began to operate as partners, the formation of a partnership was governed by RCW 25.05.055. RCW 25.05.005(6). These are provisions of the RUPA, which was adopted in Washington in 1998. LAWS OF 1998, ch. 103, § 1302.

Few reported Washington decisions apply the RUPA in determining whether individuals have formed a partnership. Since RCW 25.05.904 provides that the RUPA "shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of the act among states enacting it" it is appropriate to look to the official comments to the Uniform Partnership Act (1997), promulgated by the National Conference of Commissioners on Uniform State Laws, as aids in its construction. *Cf. Townsend v. Quadrant Corp.*, 153 Wn. App. 870, 878 n.7, 224 P.3d

8

818 (2009) (looking to comments to the uniform arbitration act as aids in construing the

Washington statute). RCW 25.05.904's command that the chapter be applied and

construed with a view to uniformity is also direct legislative authority for looking to case

law from other adopting states.

Under the RUPA, it is the attribute of co-ownership that distinguishes a

partnership from a mere agency relationship:

> A business is a series of acts directed toward an end. Ownership involves
> the power of ultimate control. To state that partners are co-owners of a
> business is to state that they each have the power of ultimate control.

UNIF. P'SHIP ACT (1997) § 202 cmt.1, 6 pt. 1 U.L.A. 93 (2001). RCW 25.05.055(3)(c)

provides three rules of construction that apply in determining whether a partnership has

been formed. Relevant here is the rule that "[a] person who receives a share of the profits

of a business is presumed to be a partner in the business," subject to a few exceptions.

By its plain terms, and as reflected in the comments to the RUPA, profit sharing gives

rise to a rebuttable presumption of a partnership. *Id.* The presumption applies whether

the profit share is a single flat percentage or a ratio that varies. *Id.*

> *The association agreements offered in evidence by the department could be*
> *terminated by a mutual oral agreement to begin operating as a partnership.*
> *It was legal error to conclude otherwise.*

Dr. Armand and Dr. Louise both testified that during the tax years covered by the

audit, the parties were operating as a partnership. Dr. Louise testified that the three

9

dentists began operating as a partnership in or about 2008. The ALJ's finding that Ms.

Hughes asked the practice bookkeeper for "copies of any agreements *to show the*

*relationship* between Dr. Armand, Dr. Louise and Dr. Loretta" (AR at 294, finding 10), is

not supported by the evidence; Ms. Hughes admitted she only asked if there *were*

agreements with the form 1099 recipients and simply assumed that the dentists stood in

an employment relationship from the two association agreements that were produced in

response.[3] Those agreements, which indisputably created an employment relationship,

---

[3] Ms. Hughes testified as follows:

Q.     Were you provided with any copies of any written contracts or
agreements between Loretta and Armand DeFelice?

A.     Yes. I asked for—when I saw their names on the 1099, I asked for
any agreements and did receive a—the agreements for each of them, that
they had signed with Dr. Armand.

AR at 108. On cross-examination, she testified:

Q.     Did you ask either lady or anyone that gave you the agreement or
agreements whether or not the agreements were valid and enforceable?

A.     Well, since I had—was talking to the bookkeeper and had asked for
the agreement, I assumed the one she gave me would be valid.

Q.     You assumed, but you didn't ask?

A.     I didn't ask if what she was giving me was valid, no.

AR at 112-13.

10

would have been 22 and 8 years old by the time of the department's 2012 audit. AR at 113-14, 125.

It was the position of the department that it didn't matter if the dentists had orally agreed to change the nature of their relationship, because they had never terminated the association agreements in writing. The ALJ adopted the position of the department, finding that the association agreements "[were] to continue until termination in a manner set forth in the agreement, specifically paragraph 7 and 8." AR at 292 (finding 2). Many of the ALJ's other findings are predicated on this legal proposition that the association agreements remained operative because they had not been terminated in the manner set forth in paragraph 7 or 8.

When, as here, the interpretation of a contract does not depend on the use of extrinsic evidence, it presents a question of law. *Viking Bank v. Firgrove Commons 3, LLC,* 183 Wn. App. 706, 711, 334 P.3d 116 (2014). A conclusion of law is reviewed as a conclusion of law, even if erroneously labeled as a finding of fact. *Dave Johnson Ins. Inc. v. Wright,* 167 Wn. App. 758, 778, 275 P.3d 339 (2012). We review conclusions of law de novo.

Section 3 of the association agreements provide the date on which the term of agreement begins and that the agreement "shall continue until terminated in a manner set forth in paragraphs 7 and 8." AR at 241, 247. Section 7 of the association agreements

11

addresses the manner by which "either" party may terminate the agreement—thereby addressing the fact that the relationship is terminable at the will of either party, as the majority observes.[4] AR at 243, 249; *see* majority at 8. Section 8 deals with termination in the event of a party's incapacity by reason of illness or other causes, an event that no one suggests ever arose. Neither section 7 nor 8 deals with termination of the agreement by mutual agreement of the parties. Notwithstanding the language of section 3 of the agreements, the parties could mutually agree, orally, to terminate or modify the agreement.

It is hornbook law that a contract in writing, but not required to be so by the statute of frauds "may be dissolved or varied by a new oral contract, which may or may not adopt as part of its terms some or all of the provisions of the original written contract." 29 RICHARD A. LORD, WILLISTON ON CONTRACTS § 73.21 at 67 (4th ed. 2003); *Bader v. Moore Bldg. Co.*, 94 Wash. 221, 224, 162 P. 8 (1917); *Sherman v. Sweeny*, 29 Wash. 321, 69 P. 1117 (1902). This is true even if there is no express agreement that the new contract shall have that effect. *E.g., Dunlap v. Fort Mohave Farms, Inc.*, 89 Ariz. 387, 363 P.2d 194 (1961) and cases cited therein.

---

[4] The section provides, "Owner and Associate may terminate their relationship upon thirty (30) days' written notice by *either* party." AR 243, 249 (emphasis added).

12

A related principle is that parties to a bilateral contract may make an agreement of rescission discharging each other from all remaining obligations under an existing agreement and that such an agreement "need not be expressed in words. Other conduct may show an intent by both parties to abandon their contract." RESTATEMENT (SECOND) OF CONTRACTS § 283, cmt. a (1981); *Lockhart v. Greive*, 66 Wn. App. 735, 741, 834 P.2d 64 (1992).

Parties may orally modify even agreements that prohibit oral modification. As explained in *Pacific Northwest Group A v. Pizza Blends, Inc.*, 90 Wn. App. 273, 277-78, 951 P.2d 826 (1998), it is "[a] paradox of the common law is that a contract clause prohibiting oral modifications is essentially unenforceable because the clause itself is subject to oral modification." The common law rule permitting oral modification "has been consistently followed in Washington." *Id.* Accordingly, even if section 3 of the association agreements could be construed to prohibit the parties from orally terminating or modifying the association relationship it would be meaningless, since section 3 was itself subject to oral modification.

In the context of professional service providers, it is not unusual for an employment relationship to ripen into a partnership. An experienced dentist, like any experienced professional, will often want the right of control over a new professional in his practice and to have the right to terminate a relationship that might not work out.

13

Once the professionals have worked together successfully over time, however, the hiring professional may well be comfortable relinquishing control and sharing ownership, and the junior professional might insist on becoming a partner. If not, she might leave in order to practice where she is better compensated and entitled to share more control.

There is no question that Dr. Armand and his daughters could implicitly terminate the association agreements by orally agreeing to begin operating as a partnership. A partnership agreement may be oral and may even be implied. RCW 25.05.005(7) (defining "partnership agreement"); *Roediger v. Reid*, 133 Wash. 608, 234 P. 452 (1925) (a partnership may be established without a formal contract and may be made by oral agreement).

If the issue of whether the dentists had modified or terminated the association agreements had been treated as an issue of fact, we would review whether substantial evidence supported the ALJ's finding. But here, the ALJ implicitly accepted the department's argument that there was no issue of fact because the association agreements were never terminated in writing; as a result, it must treat the relationship as governed by those agreements. The ALJ made no findings addressing the actual nature of the dentists' business relationship during the audit period.

The ALJ's implicit conclusion that the association agreements remained binding as a matter of law is subject to de novo review, and was in error. As a result, the

14

commissioner's adopted findings 1 through 12, all of which are predicated on the conclusion that the association agreements remained in effect as a matter of law, are unsupported.

*Sharing profits does not require strictly equal sharing and it was legal error to conclude otherwise.*

Dr. Armand and Dr. Louise both testified that in arriving at a partnership arrangement, they recognized that the dental practice ordinarily operates with overhead amounting to 60 percent of collected revenues, with the result that there is ordinarily 40 percent in profits available to share. Both testified, and the ALJ found, that by the time of the audit, Drs. Loretta and Louise were paid 40 percent of their production. AR at 294 (finding 13). This is contrary to the association agreements' provisions that the daughters would be paid 35 percent. Dr. Armand received whatever was left—which, if the parties were right about the overhead, would be something close to 40 percent of the remaining production. As Dr. Louise testified, the arrangement was designed so that all three would receive 40 percent of their production: "[B]asically all of us get—end up getting 40 percent of the amount we—of production on our patients and we split the overhead, which is 60 percent." AR at 156. The lawyer for the dental practice undertook to illustrate this from the 2010 operating results during the hearing and reproduced the analysis in his brief. *See* AR at 119-20; Br. of Appellant at 7-8.

15

The commissioner's pivotal conclusion of law identifying the basis for rejecting DeFelice Dentistry's claim to be a partnership is conclusion 7, which offers three reasons that I address here, and in the two sections that follow.

The first was that the dentists did not share profits. The ALJ implicitly accepted the department's position that it is not enough for partners to arrive at a system for profit sharing that they conclude is fair—and in this case, that the partners concluded was close enough to giving each partner an equal profit percentage on his or her production.[5]

The dentists' agreement that the daughters would receive paychecks equal to 40 percent of the professional fees collected from their services, while Dr. Armand would take "whatever was left" is not inconsistent with the existence of a partnership. RCW 25.05.015(1) provides that with respect to most matters, "relations among the partners and between the partners and the partnership are governed by the partnership agreement." Many provisions of the RUPA govern the partners' relations when the partners fail to agree on a contrary rule; a few "nonwaiveable" provisions are identified by RCW

---

[5] Conclusion 7 states in relevant part:

> First, Dr. Louise and Dr. Loretta did not share in the profits . . . . They were each paid exclusively a percentage of their own respective gross production. . . . After payments to Dr. Louise and Dr. Loretta, Dr. Armand earned only whatever was left each month.

AR at 296.

16

25.05.015(2). How partners share profits and losses is one of the matters that partners are free to decide.[6] It is only a default provision of the RUPA that provides for an equal sharing of profits and equal charging of losses if the partners have no different agreement. *See* RCW 25.05.150.

The dearth of Washington case law addressing partners' prerogatives under modern partnership statutes might have contributed to the department's and the ALJ's error. Bright line rules that might be implied by old cases on which the department relies have been rejected with the legislature's enactment, first, of the Uniform Partnership Act (UPA), and then (and even more clearly) with RUPA. As the reporters for the RUPA have explained:

> Across all substantive areas, RUPA reflects the policy judgment that, with rare exceptions, partners are permitted to govern relations among themselves by agreement. Almost all of RUPA's rules governing the relations among partners are merely default rules rather than mandatory rules. That is, the statutory rules apply only in the absence of a partnership agreement to the contrary.

---

[6] For federal tax purposes, the Internal Revenue Service also respects the parties' agreement as to distributive shares of income, gain, loss, deduction or credit (including different ratios for profits vs. losses), as long as the allocations have "substantial economic effect." 26 U.S.C. § 704. Simply stated, the requirement of "substantial economic effect" means that the allocation must be reasonably expected to substantially affect the partner's shares independent of tax consequences, and that the recipient partner must enjoy the economic benefits or bear the economic burdens associated with the allocation. Treas. Reg. § 1.704-1.

17

Donald J. Weidner & John W. Larson, *The Revised Uniform Partnership Act: The Reporters' Overview*, 49 BUS. LAW. 1, 2 (1993). While observing that under the predecessor UPA "it [was] not clear which rules are merely default rules and which rules are mandatory rules," the reporters state, "Under RUPA, every rule governing the relations among partners is a default rule unless it is separately listed as a mandatory rule."

This is not to say that how parties share profits and losses will not have a bearing on whether they are found to have "associate[ed] . . . to carry on as co-owners a business for profit," as is required to form a partnership under the RUPA. As the Supreme Court of Nebraska observed, applying the RUPA, the indicia of co-ownership, which include profit sharing and loss sharing, "are only that; they are not all necessary to establish a partnership relationship, and no single indicium of co-ownership is either necessary or sufficient to prove co-ownership." *In re Key Tronics*, 274 Neb. 936, 744 N.W.2d 425, 441 (2008).

In *Stuart v. Overland Medical Center*, 510 S.W.2d 494, 497-98 (Mo. Ct. App. 1974), a court applying the Uniform Partnership Act (UPA), the predecessor to the RUPA (the UPA was in effect in Washington from 1945 until its repeal in 1998[7]) held

---

[7] Former chapter 25.04 RCW, adopted by LAWS OF 1945, ch. 137, §§ 1-43; repealed by LAWS OF 1997, ch. 103, § 1308.

18

that an economic arrangement under which professionals received an amount equal to the revenues they produced less a percentage determined by their shared expenses was profit-sharing, explaining that "because the expenses each doctor had to pay bore no relationship to the actual expenses of each doctor, some doctors were receiving profits that otherwise might have been distributed to the doctor or doctors whose actual expenses were slight when compared to the actual expenses of other doctors." *Stuart*'s holding that individuals who share expenses indirectly accomplish profit-sharing and thereby function as a partnership has been followed under RUPA by the District of Columbia Court of Appeals. *Brown v. 1401 New York Ave., Inc.*, 25 A.3d 912, 916 n.8 (2011).

In a dental practice that the partners evidently believed had a reasonable predictable overhead burden it was reasonable that, rather than close out the books each pay period or take draws subject to a later accounting, Dr. Armand agreed that his daughters would be paid the projected net profit on their production and he would enjoy the benefit or bear the burden of any discrepancy between the projected and actual overhead.

This is not tantamount to saying that any owner of a business could pay employees a commission based on a percentage of production, call it "profit sharing," and thereby claim partnership status for purposes of the Employment Security Act. The facts in this case are distinguishable from that scenario in two respects. The first is that the

19

department never challenged that the flat 40 percent paid to Drs. Loretta and Louise was the parties' reasonable, good faith projection of net profits, supported by the income statements, with the objective that all three partners receive a fair share but without requiring more complete accounting. The second is that Drs. Armand, Loretta and Louise were prepared to argue that they operated in other respects as co-owners. If the substance of their relationship during the audit period was not more fully investigated and debated at the hearing, it was because the department, and ultimately the commissioner, concluded that what the dentists were doing *in fact* didn't matter.

By way of example, the commissioner adopted the finding that Dr. Louise and Dr. Loretta were "likely" subject to at least some direction and control by their father during the audit period, based on the 1990 and 2004 association agreements. The finding is not supported by any evidence of actual operations. Dr. Louise, the newest dentist in the practice, testified:

> Q. [D]oes he ever kind of tell you—I know he is your father—as part as your dental practice, as fathers would do, does he ever tell you how to do things?
>
> A. No.
>
> Q. Okay. You are kind of on your own, you have total discretion with your patients?
>
> A. Yes. 100 percent.

AR at 163-64.

20

If the issue of whether the dentists were operating as a partnership during the audit period had been treated as an issue of fact, taking into consideration the evidence of the dentists' intent and the aspects of their actual operations between 2010 and 2012 that would reflect on an intent to operate as co-owners, then we would review whether substantial evidence supported the ALJ's finding. One piece of that evidence would be the dentists' profit-sharing understanding. But here, the ALJ was not examining all of the evidence bearing on whether Drs. Armand, Loretta and Louise intended to operate as co-owners. Instead, the ALJ accepted the department's position that the distribution of something other than exactly equal percentages of profits was another bright-line reason for finding as a matter of law that there was no partnership. That implicit conclusion is subject to de novo review.

The more a profit-sharing arrangement deviates from what is equal or what can otherwise be defended as reasonable among partners, the more likely it will not be viewed as consistent with the intent "to carry on as co-owners a business for profit." RCW 25.05.055(1). But the RUPA expressly provides that how partners choose to divide profits is a matter for their agreement. For the commissioner to conclude that anything other than exactly equal profit-sharing prevented the formation of a partnership is contrary to Washington statutes.

21

> *It is not necessary that partners always share losses equally and it was legal error to conclude otherwise—particularly based on hypothetical losses that are unlikely ever to occur.*

The commissioner's second reason for concluding that DeFelice Dentistry was not a partnership was its acceptance of the department's position that the partners do not share losses, since "if [the daughters] did not work, they did not contribute to overhead" leaving the burden to fall disproportionately on Dr. Armand. AR at 296 (finding 7).[8] This was based on Dr. Louise's response to a hypothetical question from the department's lawyer who inquired whether, "[i]f [she] decide[d] to take the month off," she would contribute anything to overhead.[9] Dr. Louise acknowledged that in that event, based on the dentists' compensation agreement, she would not contribute to overhead. She immediately added, "But I can also tell you I have never taken a month off." AR at 159-60.

---

[8] Conclusion 7 further states:

Dr. Louise and Dr. Loretta did not share in . . . losses. . . . If they did not work, they did not contribute to overhead. After payments to Dr. Louise and Dr. Loretta, Dr. Armand earned only whatever was left each month.

AR at 296.

[9] Somewhat inconsistent with its ultimate position, the department's hypothetical suggestion that Dr. Louise might decide to take a month off attributes to her the prerogatives of an owner, not an employee. The association agreement that she signed in 2004 contemplated that she would work three days, more or less, per week. AR at 247.

First, and as with profits, a sharing of losses is not required by chapter RCW 25.05. *See* RCW 25.05.015(1) (with respect to most matters, "relations among the partners and between the partners and the partnership are governed by the partnership agreement"); UNIF. P'SHIP ACT (1997) § 401 cmt. 3, 6 pt. 1 U.L.A. 134 (2001) ("If partners agree to share profits other than equally, losses will be shared similarly to profits, absent agreement to do otherwise. . . . Of course, by agreement, they may share losses on an entirely different basis from profits.").

Washington cases have long supported partners' flexibility when it comes to sharing losses. In two decisions involving the same partnership accounting, the Washington Supreme Court reversed and remanded the accounting because the trial court failed to determine the partners' understanding as to how losses were to be borne. In the first, *Richert v. Handly*, 50 Wn.2d 356, 361-62, 311 P.2d 417 (1957), the Supreme Court recognized that the partners could, but need not, agree to share losses equally; it remanded because the trial court's findings were inconsistent as to what the partners in that case had agreed to do. In the second, *Richert v. Handly*, 53 Wn.2d 121, 123, 330 P.2d 1079 (1958), the Supreme Court held that since the trial court found upon remand that the parties never agreed upon the basis on which losses would be shared, then the court could not simply leave the parties where it found them; it was required to apply the default provisions of the former UPA. *See also Dow v. Dempsey*, 21 Wash. 86, 93, 57 P.

23

355 (1899) (citing a treatise for the proposition that "it is natural to suppose" that partners intended to share losses "if they have said nothing to the contrary"); *Refrigeration Engineering Co. v. McKay*, 4 Wn. App. 963, 974, 486 P.2d 304 (1971) (while the law will assume an agreement to share losses from silence, "If joint venturers wish to have a contrary agreement as to the sharing of losses, they can easily make an express agreement to that end.").

Washington cases recognize that some "loss sharing" is reflected in the fact that partners share net profits rather than gross revenues. *See, e.g., Oriental Realty Co. v. Taylor*, 69 Wash. 115, 120, 124 P. 489 (1912) ("It is true no mention is made of the losses, but losses, if any, must first be deducted before there could be profits, and necessarily must be borne equally"). Courts in Ohio, which has adopted the RUPA, have concluded that even limited partners, who are statutorily protected from liability, are treated as employers for unemployment contribution purposes as long as they act and are treated like general partners in virtually every important respect other than their limited liability. *Appeal of Anderson*, 29 Ohio App.3d 248, 504 N.E.2d 1155, 1159 (1985).

In this case, given the dentists' use of a projected overhead factor that was based on all collected revenues and all practice expenses, each dentist risked loss in two respects. First, and as discussed in the *Stuart* case, *supra*, each dentist faced the risk that one or two dentists might operate less economically, with the result that the overhead

24

borne by an efficient dentist would be higher than it would be if she or he were practicing alone. Second, the partners' projection of the overhead factor might prove in a given year to be too high or too low, with the result that Dr. Armand might receive a higher profit percentage or a lower percentage in some years than Drs. Loretta and Louise.[10]

The prospect of unshared loss on which the department focused and that the ALJ relied upon as a basis for its conclusion that there was not a partnership, was the prospect that one of the daughters would simply not work. The hypothetical assumed that overhead would remain the same and fall disproportionately on Dr. Armand. The hypothetical was pure conjecture. Dr. Louise testified that she had never taken a month off and the income statements in evidence demonstrated that Drs. Loretta and Louise were successful professionals, producing a substantial portion of the collected revenues of the practice.

Here, as with profit-sharing, the more a loss-sharing arrangement deviates from what is equal or what can otherwise be defended as reasonable among partners, the more likely it will not be viewed as consistent with the intent "to carry on as co-owners a business for profit." RCW 25.05.055(1). If a loss contingency is either (1) theoretically

---

[10] If the actual overhead proved to be less than 60 percent of total collected revenue, then Drs. Loretta and Louise would receive a smaller percentage profit from their production than Dr. Armand. If the actual overhead proved to be more than 60 percent of total collected revenue, then Dr. Armand would receive a smaller percentage profit on remaining revenue than was received by Drs. Loretta and Louise.

possible but highly implausible, or (2) would occur over time and could be addressed through the partners' agreement that financial interests may need to be adjusted, then it might not weigh heavily, if at all, against finding formation of a partnership. In this case, both Dr. Armand and Dr. Louise testified that when unforeseen contingencies arose in their family partnership, they "talk about it." AR at 138-39, 147 (Dr. Armand).

In any event, dispositive here is that the RUPA expressly provides that how partners choose to divide losses is a matter for their agreement. For the commissioner to conclude that anything other than exactly equal loss-sharing prevented the formation of a partnership is contrary to Washington statutes.

*The form in which Dr. Armand reported and registered the practice is insufficient as a matter of law to support characterization as a partnership. It was legal error to conclude otherwise.*

The third basis for the commissioner's pivotal conclusion that the dentists were not operating as a partnership was its findings that Dr. Armand did not update his 1966 registration with the department in 2008 to reflect the fact that he had begun operating in partnership with his daughters; that the daughters also failed to establish accounts with the department upon becoming partners in 2008; that Dr. Armand did not update his registration with the Department of Revenue to reflect partnership operations; and that Dr. Armand had continued through 2012 to report liability for federal taxes as a sole

26

proprietorship. AR at 294 (findings 14, 15, and 16).[11] As the majority recognizes, the

Internal Revenue Service has published a revenue procedure recognizing that a small

partnership (less than 10 partners) whose partners have fully reported their shares of the

income, deductions and credits of the partnership on their timely filed individual income

tax returns will satisfy the "reasonable cause" test for failure to timely file a partnership

tax return. Rev. Proc. 84-35, 1984-1 C.B. 509.

In determining the character of the business relations of parties, "[m]any times

form must give way to substance." *State v. Bartley*, 18 Wn.2d 477, 481-82, 139 P.2d 638

(1943) (arrangement was partnership in form, but not in substance).

The RUPA is even more explicit on this score. It provides that "the association of

two or more persons to carry on as co-owners a business for profit forms a partnership,

*whether or not the persons intend to form a partnership.*" RCW 25.05.055(1) (emphasis

---

[11] Conclusion 7 provided in part:

[M]ore significantly, although claiming to be a tax partnership entity, the business was registered as a sole proprietorship and did not file any notification with the state regarding its changed status. Nor did it file any federal income tax returns evidencing a partnership entity, such as a Form 1065. Dr. Armand was reporting income and expenses for the business on his individual tax return as a sole proprietorship. This is absolutely inconsistent with the Petitioner's claim the business was a partnership tax entity during the [time] period at issue.

AR at 296.

27

added). In other words, even if Drs. Armand, Loretta and Louise had intended to operate as a sole proprietorship but were acting in substance as partners, the "sole proprietorship" form of their registration and tax reporting would not matter—they would still be treated as a partnership.

A fortiori, if they were not only acting in substance as partners *but also intended to form a partnership*, the fact that they reported and registered as a sole proprietorship cannot possibly matter. To conclude otherwise is contrary to RCW 25.05.055(1).

Courts of the State of Tennessee, which has adopted the RUPA, have come to the same conclusion, reasoning that because it is not necessary under the RUPA that the parties know the legal results of their actions in creating a partnership "the terminology used by the parties to describe their business relationship is of little import." *Messer Griesheim Indus. v. Cryotech of Kingsport, Inc.*, 45 S.W.3d 588, 605 (Tenn. Ct. App. 2001) (citing *Bass v. Bass*, 814 S.W.2d 38, 41 (Tenn. 1991)).

For the commissioner to conclude that the form in which the practice was registered and reported was sufficient to defeat the existence of a partnership is contrary to Washington statutes.

*Conclusion*

When one sets aside the commissioner's unsupported factual findings and erroneous legal conclusions, there is no basis for his ultimate conclusion that DeFelice

28

*DeFelice v. Emp't Sec. Dep't*
No. 32382-0-III– dissent

Dentistry was not a partnership for tax purposes during the period covered by the audit.

Because the commissioner's decision should be reversed, I respectfully dissent.

_____
Siddoway, C.J.